Petition for review granted and cross-application for enforcement denied by published opinion. Judge NIEMEYER wrote the majority opinion, in which Chief Judge WILKINSON and Judges WIDENER, WILKINS, HAMILTON, LUTTIG, and WILLIAMS joined. Senior Judge PHILLIPS wrote a dissenting opinion, in which Judges MURNAGHAN, ERVIN, MICHAEL, and MOTZ joined.
OPINION
NIEMEYER, Circuit Judge:
After Beverly Enterprises, Virginia, Inc., refused to bargain with a unit certified by the National Labor Relations Board that included licensed practical nurses who were functioning as “charge nurses,” the Board found that Beverly Enterprises had committed an unfair labor practice under §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act. Beverly Enterprises filed this petition for review, arguing that the licensed practical nurses were “supervisors” under § 2(11) of the Act and thus were not entitled to organize and bargain collectively pursuant to § 7. Because we hold that these licensed practical nurses are “supervisors” under the Act, we grant Beverly Enterprises’ petition and deny the Board’s application for enforcement of its order.
I
Beverly Enterprises, Virginia, Inc., operates Carter Hall Nursing Home in Dryden, Virginia, a home which serves 50 patients housed in two wings with 32 and 18 beds, respectively. The top level of management at Carter Hall consists of an Administrator and three registered nurses who hold the positions of Director of Nursing, Assistant Director of Nursing, and RN Supervisor. Direct patient care is provided by six licensed practical nurses (“LPNs”) (one of whom is part-time) who function as charge nurses and 21 certified nursing assistants. The Director and Assistant Director of Nursing and the RN Supervisor do not directly supervise the nursing assistants.
The Director and Assistant Director of Nursing work at the nursing home during the first shift (8:00 a.m. to 4:30 p.m.) each weekday and the RN Supervisor works eight hours each day on Saturday and Sunday. During the second and third shifts of each day, the LPN charge nurses are the most senior employees present at the nursing home.
The written job descriptions for LPN charge nurses and certified nursing assistants specify that nursing assistants report to the LPNs and that the LPNs supervise the *293 nursing assistants. In particular, the nursing assistants’ job description directs the nursing assistants to adhere “to the instructions issued by the [LPN] charge nurse and nursing department policies and procedures,” to “perform[ ] other duties that may be assigned by charge nurse,” and to “be able to work under close supervision.” Similarly, the job description for the LPNs instructs that they are to develop a plan with team members for the care of the patients assigned to the team, “to direct and supervise the number of the nursing team carrying out the plan,” and to establish procedures whereby the team “continuously evaluates and revises the plan to meet changing needs of the patients.” The job description assigns to LPNs the responsibility for supervising nursing assistants, assigning them nursing care tasks, teaching them nursing procedures, and, when the Administrator and Director of Nursing are absent from the facility, “tak[ing] action necessary for continued operation of the nursing home.”
Consistent with these written job descriptions, the LPNs at Carter Hall assign the nursing assistants to particular patients and direct their work. While the Director and Assistant Director of Nursing formulate an overall work schedule that outlines the services to be provided to each patient, the LPNs implement the schedule and direct “everything that happens on the unit.” Based on the LPNs’ knowledge of the nursing assistants’ skills, experience, and personalities, the LPNs match the nursing assistants with the patients, filling out daily assignment sheets and adjusting them as needed. The LPNs monitor the nursing assistants’ break time and adjust breaks as needed, and they allow nursing assistants to go home early when sick. In those circumstances, the LPNs may procure replacements as necessary, but they may not discipline a replacement who refuses to show up.
While LPN charge nurses are not authorized to directly discipline nursing assistants for not coming to work or for other work infractions, the LPNs do have authority to send them home for misbehavior. In addition, the LPNs provide input for disciplinary decisions made by the Director and Assistant Director of Nursing and are authorized to “write up” nursing assistants. While this authority has only been used sporadically, in at least one situation, an LPN charge nurse sent a nursing assistant home for misbehavior and, solely on the recommendation of the LPN, that nursing assistant was discharged.
For two-thirds of the time during any given week, the LPN charge nurses are the most senior representatives of Beverly Enterprises present at Carter Hall and, during that period, they are authorized to ensure the continued operation of the nursing home in a proper manner. Thus, in eases of emergency or disaster, the LPNs are authorized to order the evacuation of the home and to direct the plan of evacuation.
On January 21, 1993, the United Mine Workers of America (the “Union”) petitioned the National Labor Relations Board (the “NLRB” or the “Board”) to hold a representational election to allow the Union to represent a unit of approximately 40 non-supervisory employees at Carter Hall, including the six LPN charge nurses. Beverly Enterprises contested the inclusion of its LPNs in the unit, but the Regional Director concluded, following a hearing, that the LPN charge nurses were covered employees and not supervisors, thus including them in the potential bargaining unit. In his findings, the Regional Director acknowledged the various responsibilities given to the LPN charge nurses, but he acted on the Board’s “reticence] to find such care-givers to be supervisors”:
The Board has carefully avoided applying a definition of “supervisor” to a health care professional who gives direction to other employees in the exercise of professional judgment, which direction is incidental to the professional’s treatment of patients, and thus is not the exercise of supervisory authority in the interest of the Employer,
(quoting St. Mary’s Infant Home, 258 NLRB 1024, 1039 (1981)).
Following an election, which the Union won, the Board certified the unit. The Union then attempted to bargain with Beverly Enterprises, but Beverly Enterprises refused. Shortly thereafter, the Supreme Court handed down its decision in NLRB v. *294 Health Care & Retirement Corp. of America, 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994), which rejected the analysis upon which the NLRB had relied to decide the employment status of the LPNs at Carter Hall. Accordingly, the Board allowed the Regional Director to reconsider his decision. The Regional Director issued a supplemental decision which reached the same outcome as his previous decision, but on different grounds. The Regional Director evaluated a few, but not all, of the responsibilities assigned to LPN charge nurses at Carter Hall and then concluded summarily that the LPNs’ functions were “routine and essentially clerical [in] nature” and therefore did not satisfy the requirements of 29 U.S.C. § 152(11) (defining the meaning of “supervisor”).
Through a separate proceeding, the Board ordered Beverly Enterprises to begin bargaining with the Union and, upon Beverly Enterprises’ refusal, found that Beverly Enterprises committed an unfair labor practice in violation of 29 U.S.C. § 158(a)(1) (prohibiting employers from interfering with employees’ exercise of rights under the NLRA) and § 158(a)(5) (requiring employers to bargain with certified representatives).
On appeal from the Board’s order, a divided panel of this court granted the Board’s petition for enforcement, holding that Beverly Enterprises’ LPNs were not supervisors under the National Labor Relations Act. See Beverly Enterprises, Virginia, Inc. v. NLRB, 136 F.3d 361 (4th Cir.1998) (per curiam). By order dated March 30, 1998, the full court vacated that panel opinion and ordered that the case be reheard en banc.
II
While the National Labor Relations Act (“NLRA”) grants “employees” the right to self-organize and bargain collectively, see 29 U.S.C. § 157; Hanna Min. Co. v. Marine Eng’rs Beneficial Ass’n, 382 U.S. 181, 188 n. 11, 86 S.Ct. 327, 15 L.Ed.2d 254 (1965), the Act’s coverage does not apply to “any individual employed as a supervisor,” 29 U.S.C. § 152(3). Accordingly, supervisors may not be certified as part of a collective bargaining unit.
The Act defines “supervisor” to mean:
[A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
29 U.S.C. § 152(11). Thus, in order to qualify as a supervisor under the NLRA, an employee must meet three criteria: (1) she must be authorized to perform or recommend at least one of the twelve duties enumerated in § 152(11); (2) her authority must promote the interest of the employer; and (3) the exercise of her authority must require the use of independent judgment. See, e.g., NLRB v. Health Care & Retirement Corp. of America, 511 U.S. 571, 573-74, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994); Glenmark Assocs., Inc. v. NLRB, 147 F.3d 333, 338-39 (4th Cir.1998).
To find that an employee has satisfied the first prong of this test, a factfinder need only find that the employee has the authority to perform any single one of the twelve enumerated duties. See, e.g., NLRB v. St. Mary’s Home, Inc., 690 F.2d 1062, 1065 (4th Cir.1982); Monongahela Power Co. v. NLRB, 657 F.2d 608, 612 (4th Cir.1981). And the employee need not actually perform an enumerated duty to satisfy the first prong so long as the employee has the authority to do so, “for it is the power and not the frequency of its use which is dispositive.” St. Mary’s Home, 690 F.2d at 1068; see also NLRB v. Tio Pepe, Inc., 629 F.2d 964, 969 (4th Cir.1980).
To meet the second prong of the test, that an employee’s authority promote the interest of the employer, the authority given to the employee must be exercisable “within the scope of employment or on the authorized business of the employer.” Health Care, 511 U.S. at 578, 114 S.Ct. 1778 (citation omitted). In the context of a nurs *295 ing home, it thus is apparent that simply because a nurse acts to care for patients does not preclude a finding that the nurse is working in the interest of the employer. See id. at 579-80, 114 S.Ct. 1778.
And finally, to meet the third prong, authority must be exercised with “independent judgment,” meaning that it must be exercised in a non-ministerial way to achieve management goals. The Court made clear in Health Care that the use of independent judgment is distinct from a mere exercise of professional expertise. Thus, when an employer grants to an employee the authority to use judgment in the management or evaluation of other employees, that judgment is .independent judgment under the NLRA, not the exercise of professional expertise. See Glenmark, 147 F.3d at 339-40(quoting Health Care, 511 U.S. at 583, 114 S.Ct. 1778); see also Passavant Retirement & Health Ctr. v. NLRB, 149 F.3d 243, 248-49 (3d Cir.1998).
In applying the definition of supervisor in 29 U.S.C. § 152(11), the Board has, we believe, manifested an irrational inconsistency. In earlier interpretations of § 152(11), the Board read the statutory definition of supervisor to include an LPN who is the most senior employee on the job site during the night shift and who has authority to assign certain duties to nurses aides and effectively to recommend their discharge. Thus, in National Living Ctrs. Inc., 193 NLRB 638, 1971 WL 32307 (1971), the Board noted:
Moody is the only L[P]N working the night shift, and is clearly responsible for seeing that the work on this shift is performed as required. As pointed out, if Moody is not a supervisor then one must conclude that the entire nursing home and its many patients are left without any direct supervision during the night hours, and this is not the case. Moody assigns certain duties to the three or four nurses aides on her shift, and checks the patients rendering the services an L[P]N is capable of giving. She has the authority to, and does, grant time off, and she also effectively recommends discharges and transfers to other shifts.
Id. at 639; see also Pine Manor Nursing Ctr. v. Warehouse, Mail Order, Office, Employees Union, 270 NLRB 1008, 1009, 1984 WL 36473 (1984) (relying principally on LPNs’ effective authority to recommend nurses aides for termination, retention, and merit-based wage increases to find the LPNs to be supervisors); Avon Convalescent Ctr., Inc. v. National Union of Hosp. and Nursing Home Employees, 200 NLRB 702, 705, 1972 WL 4691 (1972) (relying principally on LPNs’ authority to give nurses aides “directions, work orders and assignments” to find LPNs supervisors); University Nursing Home, Inc., 168 NLRB 263, 265, 1967 WL 18655 (1967) (relying on LPN’s supervision of three nurses' aides in performance of tasks for patients'and review of patients’ charts to ensure that physicians’ instructions are followed to- find the LPN a supervisor). As recently as 1993, the Board found that LPNs exercised independent judgment and therefore were supervisors when they evaluated nurses aides and furnished the evaluations to their employer to provide a basis for the nurses aides’ merit raises and departmental bonuses. See Bayou Manor Health Ctr., Inc., 311 NLRB 955, 955, 1993 WL 191457 (1993).
Yet later that same year, when considering a factual circumstance similar to those in these other cases, the Board concluded that LPNs, even though they exercised some independent judgment, were nevertheless not supervisors because the judgment they exercised was for the benefit of the patients and therefore not for the benefit of the employer. See Beverly Enterprises-Ohio, Inc., 313 NLRB 491, 1993 WL 513158 (1993). Rather than follow its precedents established in the earlier cases, the Board concluded that the LPNs were not supervisors because the exercise of independent judgment was “for the most part given as an extension of the nurses’ professional or technical judgment in the interest of providing sound patient care.” Id. at 505. Such judgment, the Board held, was not the exercise of supervisory authority “in the- interest of the employer.” Id.
After the Supreme Court in Health Care rejected the NLRB’s rule that nurses acting in the interests of their patients were not acting in the interests of their employers, the *296 NLRB crafted a new approach to the status of LPNs using different language to reach the same substantive outcome. See, e.g., Providence Hosp. and Alaska Nurses’ Ass’n, 320 NLRB 717, 1996 WL 46343 (1996); Nymed, Inc., 320 NLRB 806, 1996 WL 48265 (1996). Under' this new approach, the Board concluded that charge nurses are non-supervisory employees even when they possess the authority to assign employees work tasks based on their skills, the authority to decide when more health care workers need to come to work, the authority to let staff off work early, the authority to evaluate other work ers, and the authority to coordinate patient care within a unit — all because these types of authority were found to be lacking independent judgment. See Providence Hosp., 320 NLRB at 730-32; Nymed, 320 NLRB at 810-13. This conclusion is diametrically opposed to the Board’s earlier position that LPNs with such authority — indeed, with even less authority — exercised independent judgment. Thus, rather than return to its original reading of 29 U.S.C. § 152(11) that LPNs with the authority to assign work, to assign nurses aides to tasks, and effectively to recommend discipline are supervisors, the Board has now adopted the position that LPNs are not supervisors even though: they are the highest-ranking employees at a nursing home for two-thirds of the time; they assign and direct nurses aides; they are authorized to send nurses aides home in aggravated circumstances; and they effectively recommend discipline. What promoted this shift from its earlier position is unclear. Compare National Living Ctrs., 193 NLRB at 639. But it has prompted widespread speculation that the Board’s decisions on this subject are based not on the three-pronged test of the Act but on a “policy bias.”
In Glenmark, we noted: “We are not the first court to wonder whether this new interpretation is an end run around an unfavorable Supreme Court decision in order to provide policies of broadening the coverage of the Act, maximizing the number of unions certified, and increasing the number of unfair labor practice findings it makes.” Glenmark, 147 F.3d at 340 n. 8. And in Caremore, Inc. v. NLRB, 129 F.3d 365 (6th Cir.1997), a case involving facts and issues nearly identical to ours, the Sixth Circuit noted, in reversing the Board, that the case there was not close, id. at 370, and admonished the Board not to follow its unjustified position that “supervisory status is almost never to be accorded nurses whose supervisory authority is exercised over less-skilled professionals in the interest of patient care,” id. at 371. Indeed, in Health Care, the Supreme Court observed that because of the inconsistency of the Board’s interpretations with the statutory language and Supreme Court precedent, the Board “seeks to shift ground, putting forth a series of [unpersuasive] nonstatutory arguments.” 511 U.S. at 580, 114 S.Ct. 1778. And even before the decision in Health Care, we had noted a peculiarity in the Board’s litigating position. In St. Mary’s Home, we observed that the Board’s position on who constituted a supervisor was so manifestly inconsistent that one commentator “aptly observed” that the Board was displaying an “institutional or policy bias.” 690 F.2d at 1067.
While the NLRB’s application of the Act over which it is given charge is entitled to deference, the Board’s legal positions must nonetheless be rational and consistent with the Act. See Health Care, 511 U.S. at 576, 114 S.Ct. 1778; NLRB v. Yeshiva Univ., 444 U.S. 672, 691, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980). And at bottom “[i]t is the function of the courts ... to say what an enacted statute means.” Health Care, id. at 582, 114 S.Ct. 1778 (quoting Pierce v. Underwood, 487 U.S. 552, 566, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)). The determination of whether a given set of facts fulfills the statutory criteria poses the legal question of what the statute means.
Ill
Turning now to the circumstances before us, we must determine whether the facts of record fulfill the statutory requirements of “supervisor” (1) that the Carter Hall LPNs be authorized to perform or recommend any of the twelve duties enumerated in 29 U.S.C. § 152(11), (2) that in performing or recommending any of these duties, they act in the interest of their employer, and (3) that the *297 exercise of authority require the use of independent judgment.
First, it is clear from the record that Carter Hall LPNs perform several of the duties itemized in § 152(11). LPN charge nurses at Carter Hall indisputably have the ability and responsibility to assign and direct the 21 nursing assistants as well as to send them home if necessary and effectively to recommend their suspension or discharge. Charge nurses have the authority to assign nursing assistants to work tasks and to assign and reassign them to particular wings and patients. They also fill out daily assignment sheets for the nursing assistants that instruct the nursing assistants about the work they need to accomplish over the course of a day. Although the LPNs may not alter a nursing assistant’s job classification, they have complete authority to assign the work that is performed by the nursing assistants. Indeed,the very job description of the charge nurse recognizes the LPNs’ authority to “[a]ssign[ ] the nursing care to the patient to be given by others, utilizing the skill of the personnel to the maximum benefit of the patient.”
In addition to making work assignments, the LPN charge nurses have the authority responsibly to direct nursing assistants in their work on a daily basis. Besides directing nursing assistants in their work tasks and assignments, charge nurses are “responsible for everything that happens on the unit.” The charge nurse may alter and monitor nursing assistants’ break times, may decide when a nursing assistant may go home early, may adjust nursing assistants’ work schedules to ensure that necessary work is completed, and may decide when it is necessary to call in a replacement nursing assistant. In the case of an emergency, a charge nurse may order an evacuation of the nursing home and direct that evacuation. Furthermore, at all horn’s when a registered nurse is not on duty — virtually two-thirds of the time — “the Charge Nurse is authorized to take action necessary for continued operation of the nursing home.”
In addition, there is undisputed evidence in the record that charge nurses, have the authority to send nursing assistants home for misbehavior and effectively to recommend their discharge — to “write up” nursing assistants. Indeed, this authority has been used in its most dramatic form in at least one instance when a charge nurse suspended a nursing assistant — without any guidance from upper management — and then effectively recommended that nursing assistant’s discharge. The decision to terminate this employee “was based totally on the information that the Charge Nurse gave us about the incident and her recommendations.” The mere fact that this authority exists compels a finding that Carter Hall charge nurses undertake § 152(11) enumerated duties, even if this authority is only used on occasion. See St. Mary’s Home, 690 F.2d at 1068; Tio Pepe, 629 F.2d at 969.
As for the second prong of the supervisor status test, the charge nurses’ enumerated § 152(11) duties are, under Health Care, indisputably undertaken in the interest of the charge nurses’ employer. “Patient care is the business of a nursing home, and it follows that attending to the needs of the nursing home patients, who are the employer’s customers, is in the interest of the employer.” Health Care, 511 U.S. at 577, 114 S.Ct. 1778. The direction, assignment, and discipline of nursing assistants are management decisions made in the interest of Beverly Enterprises, and when the Carter Hall charge nurses exercise their authority to make these decisions, they act in Beverly Enterprises’ interest.
It is the third prong of the § 152(11) test — whether the charge nurses exercise independent judgment — on which the Board relies in this case to argue that LPNs are not supervisors. Although the Board acknowledges that Carter Hall charge nurses direct and assign work to nursing assistants, it argues that they “do so only in a ‘routine manner’ without utilizing ‘independent judgment.’ ” The record, however, does not support this position.
To begin with, almost two-thirds of the time that Beverly Enterprises operates Carter Hall — 15 jé hours a day on weekdays and 16 hours a day on weekends — LPN charge nurses are the most senior staff at Carter Hall. During this time, they are authorized *298 “to take action necessary for continued operation of the nursing home.” It strains credulity to imagine that for two-thirds of the operating time of the nursing home, no judgments other than routine and clerical judgments are made to keep the home operating. See Glemnark, 147 F.3d at 341-42; see also National Living Ctrs., 193 NLRB at 639 (where the Board made the same observation under its earlier position). During this time, LPNs are faced with an array of decisions that require independent judgment. Among other responsibilities, they are required to decide which nursing assistants work where, which nursing assistants are to provide treatment for which patients, whether a nursing assistant’s misbehavior warrants sending the nursing assistant home, and whether exigent circumstances require an evacuation of the nursing home. These are not the decisions of a mere “night watchman.” To the contrary, such decisions, made without guidance from upper management, clearly require judgment that is “sensitive and nuanced,” and much more than ministerial. See Caremore, 129 F.3d at 370.
Moreover, these judgments are by and large made without any guidelines or established criteria. As the Board concedes, Beverly Enterprises provides no list of criteria by which assignments, direction of nursing assistants, or emergency dismissals are to be made. LPN charge nurses are thus “responsible for everything that happens on the unit” without having any guidelines to instruct them how to undertake that responsibility. The reason such guidelines are absent is clear — the charge nurses have the authority to undertake them duties using their independent judgment.
Furthermore, contrary to the position taken by the Board, the decisions that the charge nurses make are management decisions, not, ones related solely to a nurse’s professional expertise. The Board would collapse the distinction between management prerogatives and professional knowledge. But the assignment of work, direction of nursing assistants, discipline of nursing assistants, and similar duties are not simply professional medical functions. Rather, such decisions are part and parcel of what it means to be a manager and a supervisor. Every assignment of work requires some level of expertise, but supervisors need not be ignorant of the work situation which they supervise to fall within the § 152(11) definition of “supervisor.” Rather, certain types of deci-sional authority, regardless of the manager’s professional knowledge, make one a supervisor under the NLRA.
In this case, the Carter Hall LPNs have the authority to run the home in the absence of other management. They assign tasks to personnel and personnel to tasks and work locations. They regulate tasks and work-breaks as well as direct the nursing assistants in the completion of their work in an entirely discretionary manner. They are even authorized to transfer nursing assistants to different wings of the nursing home at their discretion, and they are authorized to send a nursing assistant home for misbehavior without the approval of other management. Finally, they can declare and direct an evacuation when they deem the circumstances warrant it. Such decisions, by then-very nature, make one a supervisor under the NLRA.
In so holding, we continue in line with our precedents in Glenmark and St. Mary’s Home, and we note our circuit’s agreement with the general approach taken on this issue by the Third and Sixth Circuits. See Passavant Retirement & Health Ctr. v. NLRB, 149 F.3d 243, 248-49 (3d Cir.1998); Mid-America Care Found. v. NLRB, 148 F.3d 638, 640—41 (6th Cir.1998); Caremore, 129 F.3d at 368-71. Although we reach a different result than that reached in somewhat similar circumstances by the D.C., Eighth, and Ninth Circuits, see Beverly Enterprises, Minnesota, Inc. v. NLRB, 148 F.3d 1042, 1046-48 (8th Cir.1998); Beverly Enterprises-Pennsylvania, Inc. v. NLRB, 129 F.3d 1269, 1270-71 (D.C.Cir.1997); Providence Alaska Med. Ctr. v. NLRB, 121 F.3d 548, 552-55 (9th Cir.1997), we note that the legal determination of whether an LPN is a supervisor depends of necessity on the underlying facts. To the extent that these circuits reach a different conclusion on the statutory meaning of inde *299 pendent judgment, however, we decline to follow their approach.
Accordingly, Beverly Enterprises’ petition for review is granted and the NLRB’s decision is reversed. The NLRB’s application for enforcement of its order is denied.

IT IS SO ORDERED.