**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**and**

**United Food and Commercial Workers, Local No. 1444, Intervening Petitioner,**

**v.**

**GRANCARE, INC., d/b/a Audubon Health Care Center, Respondent.**

No. 97–3431.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1998.

Reargued En Banc Dec. 17, 1998.

Decided March 3, 1999.

John D. Burgoyne, John Arbab (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, for Petitioner.

Christopher J. Johnson (argued), Beck, Chaet, Loomis, Molony & Bamberger, Milwaukee, WI, for Respondent.

Scott D. Soldon, Naomi E. Soldon (argued), Previant, Goldberg, Uelmen, Gratz, Miller & Bruegeman, Milwaukee, WI, for Intervenor–Petitioner.

Before POSNER, Chief Judge, and COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, DIANE P. WOOD, and EVANS, Circuit Judges.[1]

TERENCE T. EVANS, Circuit Judge.

The line that separates employees who can unionize from supervisors who can't is not always clear. This is particularly true for nurses in the health care field, whose duties and lines of responsibility can sometimes be fuzzy. Our case today concerns licensed practical nurses (LPNs) at a nursing home in Wisconsin. Are they just employees of the home or are they supervisors as that term is defined by the National Labor Relations Act (NLRA), 29 U.S.C. § 152(11)?

GranCare, Inc. operates a 282–bed nursing home in Bayside, Wisconsin, a suburb of Milwaukee. The home, which GranCare calls the Audubon Health Care Center, is divided into several units, the largest being a nursing department consisting of a director of nursing, an assistant director of nursing, 19 registered nurses (RNs), 38 LPNs, 90 certified nursing assistants (CNAs), and a handful of clerical employees we need not consider in our discussion.

At any nursing home, someone has to perform rather basic, though nevertheless important, tasks. Someone must help groom, feed, and toilet the residents and · change their bed linens. At Audubon, those tasks primarily fall to CNAs, the largest employee group, and everyone in this case agrees that they are not supervisors under the NLRA. Above, and way above, the CNAs are Audubon's LPNs and RNs. Everyone agrees that the RNs, 19 of them at Audubon, are supervisors under the NLRA. But the rubber meets the road with the LPNs, who lie betwixt and between lowly CNAs and lofty RNs.

The differences between Audubon's three levels of nursing department personnel are largely based on education and training: RNs have more of both, are paid more money, and have, within the pecking order of medical regulations, higher licenses. By virtue of their licenses, RNs can perform advanced tasks. For example, RNs can initiate IVs, and for LPNs that is verboten. RNs regularly attend meetings regarding Medicare staffing and rehabilitation, and they often interact with physicians. If nursing employees are absent, RNs are responsible for scheduling replacements. RNs, unlike LPNs, often work from supervisory offices for which they are given keys. RNs also perform evaluations of the CNAs and attend weekly management meetings with GranCare's director of nursing. Also, RNs are salaried and do not punch a time clock. CNAs and LPNs, on the other hand, are paid by the hour and punch time clocks to signal their arrival at and departure from work. During the evening hours, when few workers are on hand, a single "house supervisor RN" is in charge of the facility. This is compatible with Wisconsin law, which the parties tell us requires that an RN be present at the home at all times.

■ LPNs act as "charge nurses," meaning they are expected to "take charge" by directing the CNAs, using discipline when necessary, and handling complaints. LPNs, according to GranCare, are told that "[t]he role of the Charge Nurse is more than passing meds and doing treatments. The Charge Nurse is a 'management' role in assisting the RN, supervision and direction of CNA's, communicating with MD's, team work with the CNA's (i.e. feeding, answering lights, etc.)." Does this make GranCare's LPNs "supervisors" under the NLRA? The answer to that question will resolve this case.

The Board interprets and applies an ambiguous definition of the term "supervisor" because that is what Congress supplied in 1947 when it removed certain employees from coverage under the NLRA. A "supervisor," starting in 1947, could no longer be in a

1. Circuit Judge Walter J. Cummings did not par- ticipate in this decision.

union, and § 2(11) of the NLRA defined a supervisor as

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

■ We discussed, fully, this definition—particularly its origin and purpose—in light of the overall scheme of the NLRA in *N.L.R.B. v. Res–Care, Inc.*, 705 F.2d 1461, 1465–66 (1983). We need not repeat our observations in that case here, but we emphasize that what we said then is equally true today, 16 years later. We also recognize today, as we did in 1983, that when we review the Board's application of its understanding of the term "supervisor" we are "in a gray area, where it is necessary to consider whether the balance of power and conflict of interest concerns that lie behind section 2(11) justify the Board's finding." *Res–Care*, 705 F.2d at 1466.

In interpreting § 2(11) the Board considers three questions, and each must be answered affirmatively if an employee is to be deemed a supervisor. First, does the employee have authority to engage in 1 of 12 listed activities? Second, does the exercise of that authority require "the use of independent judgment"? Third, does the employee hold the authority "in the interest of the employer"? *Northcrest Nursing Home*, 313 N.L.R.B. 491, 493, 1993 WL 513158 (1993).

In our case, the Board's Regional Director found that GranCare's LPNs were employees, not supervisors, because their assignment and direction of CNAs was not done in the interests of the employer. The Director then determined that the LPNs could be joined with the CNAs (and a few other employees not at issue here) into a potential bargaining unit, and he ordered a union representation election.

GranCare sought review of the Director's decision, and while its petition was pending (but before the election) the Supreme Court decided *NLRB v. Health Care & Retirement Corp. of America*, 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994) (*HCR*), which addressed the Board's test for determining whether LPNs, acting as charge nurses, are supervisors. The Board's position was, in all similar cases including ours, that a charge nurse's "supervisory activity is not exercised in the interest of the employer if it is incidental to the treatment of patients." 511 U.S. at 576, 114 S.Ct. 1778. The Court rejected the Board's position as a "strained interpretation" of the phrase "in the interest of the employer," *id.* at 583, 114 S.Ct. 1778, and concluded that the four LPNs at issue—who were grouped with five to seven "staff nurses," including RNs—exercised their authority "in the interest of the employer." Because the Board sought to affirm its finding of nonsupervisory status only on the basis of its interpretation of that phrase, the LPNs in *HCR* were held to be supervisors under the NLRA.

The *HCR* decision prompted the Board to send our case (and others around the country) back for reconsideration. The Regional Director reopened proceedings and allowed additional evidence. He then issued a second decision reaffirming his conclusion that GranCare's LPNs are not supervisors, this time holding that they did not exercise independent judgment in their assignment, direction, and discipline of the CNAs. The Board embraced the Director's second view of the case. GranCare disagreed and refused to bargain with the certified union, which caused the NLRB to petition for enforcement of its order that it do so.

It may be troubling to some that the Board, after *HCR*, switched gears and emphasized a different question (number 2, rather than 3, of the questions that must be affirmatively answered to find supervisory status) in concluding that GranCare's LPNs were not supervisors. The Fourth Circuit recently observed that the Board's decision to change its point of emphasis seems to be "based not on the three-pronged test of the Act but on a 'policy bias.'" *Beverly Enter-*

*prises, Virginia, Inc. v. N.L.R.B.*, 165 F.3d 290 (4th Cir.1999) (*en banc*). But we decline to look for sinister motives. It is not our task to conjecture about whether the Board has tried to do an end run around an unfavorable Supreme Court decision so it can broaden coverage under the Act. Instead, we must decide if the Board's post-*HCR* reason for concluding that GranCare's LPNs are not supervisors—because they do not exercise independent judgment, as the Board understands that term, in their assignment, direction, and discipline of the CNAs—is a reasonable conclusion to draw from the evidence. We are guided by several solid principles of law as we review this issue.

■ First, we apply a deferential standard of review to the Board's determination because it rests, at least in part, on a factual finding. *Res–Care*, 705 F.2d at 1465. Second, unless we can fairly say that its view is "arbitrary [or] capricious" within the meaning of the Administrative Procedure Act (APA), we owe deference to the Board's construction of the terms of the statute. *See* 5 U.S.C. § 706. And, more particularly, we owe the Board deference when it is involved in the construction of an ambiguous provision of a statute it must enforce. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). And the Supreme Court characterized the term "independent judgment" in the statute (§ 2(11)) as ambiguous in *HCR*, 511 U.S. at 579, 114 S.Ct. 1778.

■ On top of this, it is important to keep in mind that Congress, in enacting § 2(11), sought to distinguish between true supervisors, those vested with "genuine management prerogatives," and other employees. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 281, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). As regards nurses, we observed in *Res–Care, Inc.* that

> although the nurses may have some supervisory authority, the "if" clause in section 2(11) ... was intended to exclude from the definition of supervisor "straw bosses," "lead men," and other low-level employees having modest supervisory authority ... and the fact that these nurses are, if not full-fledged professionals, at least sub-pro-

fessionals, indicates that their possession of some "supervisory" authority, loosely defined, need not prevent the Board from classifying them as employees rather than supervisors.

705 F.2d at 1466.

■ Finally, consistent with congressional intent, "the board has a duty to employees to be alert not to construe supervisory status too broadly because the employee who is deemed a supervisor is denied employee rights which the act is intended to protect." *Westinghouse Elec. Corp. v. N.L.R.B.*, 424 F.2d 1151, 1158 (7th Cir.1970). *Accord Holly Farms Corp. v. NLRB*, 517 U.S. 392, 116 S.Ct. 1396, 1401, 134 L.Ed.2d 593 (1996) ("administrators and reviewing courts must take care to assure that exemptions from NLRA coverage are not so expansively interpreted as to deny protection to workers the Act was designed to reach").

■ In the aftermath of *HCR*, the Board announced that it would treat LPNs "the same as all other employee classifications and ... apply to them the same test as [it] appl[ies] to all other employees." *Ten Broeck Commons*, 320 N.L.R.B. 806, 810, 1996 WL 48265 (1996). The Board has also properly recognized, as we did in *Res–Care*, that it must take into consideration the fact that charge nurses are employees who, in their day-to-day work, exercise certain judgments which, even though advanced, are not necessarily supervisory in nature. *See Providence Hospital*, 320 N.L.R.B. 717, 1996 WL 46343 (1996). And as we observed in another of our cases:

> The most important point that the Center overlooks in emphasizing the supervisory responsibilities of the charge nurses ... is that nurses are professionals and their exercise of supervision is guided by professional training and norms. The charge nurses in this case are registered nurses, who are highly trained and responsible. Supervision exercised in accordance with professional rather than business norms is not supervision within the meaning of the supervisor provision, for no issue of divided loyalties is raised when supervision is required to conform to professional stan-

dards rather than to the company's profit-maximizing objectives.

*Children's Habilitation Center, Inc. v. N.L.R.B.*, 887 F.2d 130, 134 (7th Cir.1989).

In *Children's Habilitation*, we also identified two other relevant factors to consider about nurses:

> Our analysis of the Board's determinations in *Res–Care* and in *American Medical Services* emphasized two considerations. They will continue to be our guiding lights in charge-nurse cases. The first is the ratio of supervisory to nonsupervisory employees under the competing positions of the parties; the second is the disciplinary authority of the alleged supervisors. The first consideration is central to the balance of power concern, the second to conflict of interest.

887 F.2d at 132.

GranCare cites several decisions of the Sixth Circuit, including *Caremore, Inc. v. N.L.R.B.*, where that court, applying tests it developed, rejected Board findings of employee status for charge nurses. 129 F.3d 365 at 369–70 (1997). It asks us to "adopt the conclusions and rationale of the Sixth Circuit," which are essentially the same as the Fourth Circuit's view in *Beverly Enterprises, Virginia* and the Third Circuit's opinion in *Passavant Retirement & Health Center v. N.L.R.B.*, 149 F.3d 243 (1998). However, as we noted in *Children's Habilitation*, several Sixth Circuit's cases are "in considerable but unacknowledged tension with our decisions in *Res–Care*" and other cases. 887 F.2d at 134. We also note that although the Supreme Court, in *HCR*, affirmed the result reached by the Sixth Circuit on the narrow "patient care" issue, it did not pass on the other tests used by that court. The traditional modes of analysis we used in *Res–Care* and *Children's Habilitation* are, we think, still the best course to take. And our view of the global issue in this case is consistent with the positions taken by the D.C., Eighth, and Ninth Circuits, *see Beverly Enterprises–Massachusetts, Inc. v. N.L.R.B.*, 165 F.3d 960 (D.C.Cir.1999); *Beverly Enterprises–Pennsylvania, Inc. v. N.L.R.B.*, 129 F.3d 1269 (D.C.Cir.1997); *Beverly Enterprises, Minnesota, Inc. v.*

*N.L.R.B.*, 148 F.3d 1042 (8th Cir.1998); and *Providence Alaska Med. Ctr. v. N.L.R.B.*, 121 F.3d 548 (9th Cir.1997), and the views expressed by Judge Phillips in persuasive dissents to the Fourth Circuit opinions, *Beverly Enterprises, Virginia* and its companion, *Beverly Enterprises, West Virginia*, 165 F.3d 307 (4th Cir.1999).

Turning to our case, we noted early on that GranCare's nursing department contained, in addition to a director and an assistant director, approximately 19 RNs, 38 LPNs, and 90 CNAs. Of these, it is conceded that 21 are supervisors and 90 are employees, with the 38 LPNs, acting as charge nurses, in the middle. If, as the Board found, the LPNs are not supervisors, the ratio of supervisors to nonsupervisors at the time of the election is a normal appearing 21 to 128. With that ratio, 14 percent of the nursing work force are supervisors. On the other hand, if the LPNs are supervisors, the ratio of supervisors to nonsupervisors becomes an unwieldy 59 to 90, a top-heavy setup that we think would be bizarre to say the least.

Such a highly improbable ratio of bosses to drones "raises a warning flag," *N.L.R.B. v. American Med. Servs., Inc.*, 705 F.2d 1472, 1473 (7th Cir.1983). As we stated in *Res–Care*, "[I]f the licensed practical nurses were classified as supervisors, almost one-third of the nursing home's staff would be barred from the protections of the Act, and the Board could reasonably believe that the balance of power would shift too far toward the employer." 705 F.2d at 1468. A similar finding in our case would be more drastic, leaving some 40 percent of GranCare's caregiving work force outside the protection of the NLRA.

■ The concept of "independent judgment" under § 2(11) is, at its core, concerned with those who work at the margins of supervisory authority. The Board must draw a line separating the lowest level of true supervisors—those who are part of management's team—from those valuable employees who are just on the other side of the line. Those just on the other side of the line are employees who exercise some authority but not

enough to be considered more than part of the regular work force. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 280–81, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974).

It seems that in comparable post-*HCR* LPN-as-supervisor cases around the country the Board is generally concluding that the supervisory authority typically exercised by LPNs over CNAs is not exercised with "independent judgment" as contemplated by § 2(11). Specifically, the Board has taken the position that the "judgment" of LPNs in exercising their incidental supervisory authority over CNAs is not the "independent judgment" concerned with management prerogatives contemplated by § 2(11). Rather, it is more properly viewed as "professional judgment" exercised in getting their assigned work done with the assistance of CNAs employed for that purpose. It seems to us that, given the nature of the LPN charge nurses' primary work activity and incidental supervisory function in the classic pattern of these cases, the Board's construction of "independent judgment" for application to them cannot be declared "arbitrary [or] capricious" under the APA. We think it is a permissible construction of an ambiguous term entitled to deference under *Chevron*.

The record before the Board supports the conclusion that although GranCare's LPNs have some assignment, scheduling, and disciplinary powers over CNAs, they exercise those powers in fairly routine, preordained ways. They act more like "straw bosses" than foremen. We cannot say that the Board's understanding of the concept of "independent judgment" is arbitrary or capricious, or that the application of that understanding to GranCare's LPNs as a factual matter is without evidentiary support. The Board's view also results, as we just noted, in a more realistic boss-to-worker ratio, which is further evidence of the merit of its interpretation of the concept of "independent judgment." Because no other significant issues prevent enforcement of the NLRB's order in this case, ENFORCEMENT is ordered.

KANNE, Circuit Judge, joined by COFFEY, Circuit Judge, dissenting.

Today, this court concludes that Licensed Nurse Practitioners ("LPNs") are not super-

visors within the meaning of the National Labor Relations Act ("the Act"). It reaches its decision by mistakenly deferring to the National Labor Relations Board's ("NLRB" or "the Board") interpretation and application of the statutory term "independent judgment." In doing so, the majority also improperly elevates two policy concerns over the language found in the Act itself. Therefore, I must respectfully dissent.

While it is true that courts review Board decisions with a deferential eye, it is not a blind one. Courts owe agencies a measure of deference with regard to actions, findings, and conclusions, unless they are arbitrary, capricious, or an abuse of discretion. *See* 5 U.S.C. § 706(2)(A). The Supreme Court explained this standard and established a two part test to guide courts in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron*, upon which the majority relies, courts should defer to agency interpretations of their enabling statutes only if the statutory term being interpreted is ambiguous and if the interpretation constitutes a "permissible construction of the statute." *Id.* As the Fourth Circuit recently explained, while the Board's interpretation of the Act is entitled to deference, "the Board's legal positions must nonetheless be rational and consistent with the Act." *Beverly Enters., Virginia, Inc. v. NLRB*, 165 F.3d 290, 296–97 (4th Cir.1999); *see also NLRB v. Health Care & Retirement Corp. of Am.*, 511 U.S. 571, 576, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994).

Even though courts may rely upon the *Chevron* analysis, they are not required to follow this standard in all cases. In *NLRB v. Res–Care, Inc.*, 705 F.2d 1461, 1466 (7th Cir.1983), this court noted that the Board's finding with respect to LPNs:

is a finding that necessarily leans heavily on an interpretation of the statute; and while the Board is entitled to some judicial deference in interpreting its organic statute as well as in finding facts, it would be entitled to even more if it had awakened its dormant rulemaking powers for the

purpose of particularizing the application of section 2(11) to the medical field.

*Id.* Thus, less deference is afforded when agencies act outside their rulemaking authority. Courts also do not owe agencies deference when they act manipulatively. *See Children's Habilitation Ctr., Inc. v. NLRB,* 887 F.2d 130, 132 (7th Cir.1989) ("[A]n administrative agency, like any other first-line tribunal, earns—or forfeits—deferential judicial review by its performance."). Acting manipulatively demonstrates that an agency's interpretation is not rational and consistent with its enabling statute. While the Supreme Court acknowledges that the term at the heart of this debate—"independent judgment"—is ambiguous, *see Health Care & Retirement Corp.,* 511 U.S. at 579, 114 S.Ct. 1778, the Board's interpretation is a not-so-subtle attempt to side step the Supreme Court's ruling in *Health Care & Retirement Corp.* As a result, the Board is not entitled to *Chevron* deference.

The Board's propensity to engage in manipulation of the term "supervisor" is well known. *See, e.g., NLRB v. Winnebago Television Corp.,* 75 F.3d 1208, 1214 (7th Cir. 1996) (observing that the Board has a reputation for "well-attested manipulativeness" that earns it little deference from the courts). The majority concludes, however, that we should not "look for sinister motives" in the Board's interpretation of "independent judgment." However, this "see no evil" view contradicts what we have previously recognized. In *Res–Care,* we stated that the Board, by engaging in a case-by-case analysis rather than establishing a method of review through the rulemaking process, "has laid itself open to charges that its decisions applying to section 2(11) have been more than tinged by opportunism—that it construes 'supervisor' broadly when the question is whether an employee's unlawful act can be imputed to the employer and narrowly when the question is whether the employee is protected by the Act." 705 F.2d at 1466 (citations omitted). We have also recognized the existence of "judicial impatience with the Board's well-attested manipulativeness in the interpretation of the statutory test for 'supervisor.'" *Children's Habilitation,* 887 F.2d at 132; *accord NLRB v. St. Mary's*

*Home, Inc.,* 690 F.2d 1062, 1067 (4th Cir. 1982). Thus, questioning the Board's motives is a rational and necessary approach in light of its historical conduct with regard to this provision of the Act.

In the case before us, the Board continues its practice of cynically manipulating the Act. The Board's interpretation of "independent judgment" as creating a distinction between "professional" and "managerial" judgment enables it to reach the same conclusion—that LPNs are not supervisors—that it had under its earlier rejected interpretation of the Act. The fact that the Board did not adopt its "professional"/"managerial" distinction through a legitimate rulemaking procedure, nor establish a consistent standard explaining the content of the test, also lessens the court's duty to defer to the Board.

I am further troubled by a willingness to skim over the facts surrounding the process by which the Board reached its interpretation. The majority concludes that the court must be "guided by several solid principles of law" in its review of the case rather than conjecture of improper agency behavior. It is not conjecture, however, but rather a simple illumination of the procedural history of this case that leads me to conclude that the Board, once again, is manipulating its enabling statute to achieve the result it desires.

In its first decision involving GranCare LPNs, the Board stated:

[a]ssignment of work and direction of the [certified nursing assistants] CNAs is done in the LPNs' technical capacity. Thus, while at times it may constitute the utilization of independent judgment, it is judgment utilized in the Nurses' treatment of patients and does not constitute the exercise of supervisory authority in the interests of the Employer.... **The Employer herein has hired [registered nurses] RNs and LPNs for their expertise and ability to exercise independent judgment involving patient care.** Professional and technical employees do not lose their protections of the Act merely because they exercise independent judgment in matters relating to patient care.

(emphasis added). It could not be clearer from that earlier decision that the Board determined that LPNs exercise independent judgment—but it held that LPNs were not supervisors under the Act because they did not exercise their authority "in the interests of the employer."

That patient care analysis, which resulted in LPNs being classified as nonsupervisors, fell flat when challenged before the Supreme Court, however, and was rejected. *See Health Care & Retirement Corp.*, 511 U.S. at 577–78, 114 S.Ct. 1778. The Board was, thus, forced to reconsider the status of these LPNs. In this second round, the Board again reached its preordained conclusion. This time the Board found that the LPNs engaged in the same, if not more, supervisory duties. But now, however, the LPNs have mysteriously lost the independent judgment previously found by the Board, thus, enabling the Board to say again that LPNs are not supervisors—now because they do not exercise independent judgment when engaging in supervisory duties.

This history of tortured interpretations indicates that the Board's post-*Health Care & Retirement Corp.* analysis is the classic outcome oriented approach it has utilized in the past. By its conduct, the Board has forfeited Chevron deference. *See, e.g., Providence Alaska Med. Ctr. v. NLRB*, 121 F.3d 548, 556 (9th Cir.1997) (Noonan, J., dissenting) ("Deference should not be accorded an interpretation that it has taken 50 years to reach and ... has been brought forward as an end run around [*Health Care & Retirement Corp.*] as decided by the Supreme Court."). To simply defer to the agency in this case removes the protections afforded through judicial review of agency actions. Agencies must be accountable. If they are never subject to levels of judicial review higher than that of complete deference, even when they act manipulatively, a world of government without accountability not contemplated by the Supreme Court in *Chevron* or Congress in the Administrative Procedure Act is created.

Thus, it is my conclusion that in this case we should review the Board's determination that LPNs are not supervisors under a substantial evidence standard of review. *See*

*Mid–America Care Found. v. NLRB*, 148 F.3d 638, 643 (6th Cir.1998). This standard requires a court to affirm the decision of any agency only if substantial evidence in the record supports it. *See American Diversified Foods, Inc. v. NLRB*, 640 F.2d 893, 894–95 (7th Cir.1981). Under this standard, courts do not merely:

> rubber-stamp the Board's decision simply because the supporting evidence may be "substantial" when considered by itself and in isolation from the evidence that fairly detracts from the Board's conclusion.... Rather, [they] must take into account the entire record, including evidence opposed to the Board's view from which conflicting inferences reasonably could be drawn.

*NLRB v. Adam & Eve Cosmetics, Inc.*, 567 F.2d 723, 727 (7th Cir.1977) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–81, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Application of this standard leads me to conclude that the LPNs under this specific set of facts are supervisors under the Act.

In determining whether the Board's decision is supported by substantial evidence we must look to the statutory test found in the Act. *See Health Care & Retirement Corp.*, 511 U.S. at 573–74, 114 S.Ct. 1778. The Act provides a three part test to establish whether an employee is a supervisor. *See id.; see also* 29 U.S.C. § 152(11). First, the employee must have authority to engage in one of the listed activities. *See Health Care & Retirement Corp.*, 511 U.S. at 574., 114 S.Ct. 1778 Second, the employee must use independent judgment in exercising that authority. *Id.* Third, the employee must hold the authority in the interest of the employer. *Id.* Neither party disputes whether the LPNs act in the interest of the employer. It is also clearly established that the LPNs engage in at least one of the twelve listed activities enumerated in the statute. At a minimum, for example, they meet the "authority to assign" and the "responsibility to direct" criteria. *See* 29 U.S.C. § 152(11).

The only remaining issue, of course, is whether LPNs exercise independent judgment. The Board has not engaged in rulemaking to aid in the analysis of what constitutes the exercise of independent judgment.

In resolving the issue, the courts must, therefore, first and foremost be guided by the text. *See Bass v. Stolper, Koritzinsky, Brewster & Neider,* 111 F.3d 1322, 1324 (7th Cir.1997) ("As with all issues of statutory interpretation, the appropriate place to begin our analysis is with the text itself.").

However, rather than rely upon the text of the statute to reach its conclusion, the majority focuses primarily upon the secondary indicia this court adopted in *Res–Care,* 705 F.2d at 1468, and *Children's Habilitation,* 887 F.2d at 132. While the ratio of supervisory to nonsupervisory employees and the disciplinary authority of the employees in question may help a court to determine whether certain employees are supervisors, these factors are not part of the statutory language and, thus, are not determinative on the issue. *See E & L Transp. Co. v. NLRB,* 85 F.3d 1258, 1270 (7th Cir.1996). These indicia, conceived before the Supreme Court decided *Health Care & Retirement Corp.,* should serve as the guiding lights we intended them to be rather than be cast as controlling requirements that must be met. They are incorporated in neither the enabling statute nor rules adopted by the Board.

In contrast to the majority's analysis, the Supreme Court followed a text-centered approach for determining whether an employee rises to the level of a supervisor under the Act in *Health Care & Retirement Corp.* The Court conducted a fact-specific examination of the case, relying only upon the statutory text to reach its conclusion. *See Health Care & Retirement Corp.,* 511 U.S. at 580, 114 S.Ct. 1778. With a skeptical eye, the Court discussed policy considerations of the Act only after it reached a conclusion based on the textual analysis. *See id.* at 580–82, 114 S.Ct. 1778. Thus, we should adhere to the Supreme Court's approach that the Act must be enforced according to the textual language, rather than based upon secondary indicia evolved from policy considerations. To do otherwise forces this court to step beyond its authority.

In an attempt to establish a legal grounding for its conclusion, the Board also claims to rely primarily upon the statutory text. It attempts to establish an interpretation of

"independent judgment" that creates a nontextually based distinction between "professional" and "managerial" judgment. As the Supreme Court has noted, "[t]he Act does not distinguish professional employees from other employees for purposes of the definition of supervisor in § 2(11). The supervisor exclusion applies to 'any individual' meeting the statutory requirements, not to 'any nonprofessional employee.'" *See id.* at 581, 114 S.Ct. 1778; *see also* 29 U.S.C. §§ 152(11) & (12). This distinction exemplifies the tension between the Act's exclusion of "supervisors" from its protection and the inclusion of "professional employees." *See Health Care & Retirement Corp.,* 511 U.S. at 588–89, 114 S.Ct. 1778 (Ginsburg, J., dissenting) (noting that the tension between the exclusion of supervisors and inclusion of professional employees exists because many professional employees may meet the Act's definition of supervisor). In essence, the Board has simply renamed the act of exercising "independent judgment"; it has changed neither the character of the test nor the manner in which an employee's exercise of independent judgment is assessed.

In applying the statutory test of independent judgment, I believe the record as a whole demonstrates that the LPNs' duties qualify them as supervisors. Their duties include assigning CNAs to patients, supervising CNA tasks, transferring CNAs to other wings within the facility when necessary, monitoring CNAs, determining whether CNAs complete their tasks properly and in accordance with patient care requirements, performing CNA evaluations, issuing commendations to CNAs, disciplining CNAs, scheduling specific CNAs to specific tasks, and rearranging CNA break times. In addition, when CNAs fail to perform their duties correctly, the LPNs are held accountable. In performing these duties LPNs must exercise independent judgment in both a professional and managerial sense. The decisions made during an LPN's shift are similar to those of shift managers who allocate assignments to counter employees in a fast food restaurant and who we held were supervisors under the Act. *See American Diversified Foods,* 640 F.2d at 896–97. The language

explaining our decision in that case is equally applicable to the LPNs.

Although external considerations clearly affect the shift manager's discretion when making these assignments, nothing prevents the shift manager from basing his decision, at least in part, on the requirements of the specific job and his opinion of the counter employee's individual capabilities. This is sufficient exercise of his independent judgment.

*Id.* at 896 (citations omitted). Similarly, LPNs make their decisions based upon their professional knowledge, as well as the managerial policies of the nursing home. The record lacks evidence suggesting that LPNs follow a specific procedure in assigning CNAs or that they consult with an RN during the assignment process. No evidence exists in the record indicating that these duties are merely routine or clerical either. LPNs must assess the CNAs' experience and responsibility, determine how much monitoring each individual CNA requires, as well as consider the needs of the patients to whom the CNAs are assigned. Based on the text of the Act alone, the LPNs are required to exercise independent judgment in fulfilling their duties. There is little, if any, evidence in the record supporting the Board's conclusion that these LPNs are not supervisors because their decisions are based entirely upon professional judgment.[1] Thus, I do not believe the Board's conclusion is supported by substantial evidence in the record.

The Fourth Circuit *en banc* reached a similar conclusion in two cases involving the status of LPNs acting as charge nurses un-

der the Act.[2] *See Beverly Enters., Virginia,* 165 F.3d at 297–99; *Beverly Enters., West Virginia, Inc. v. NLRB,* 165 F.3d 307, 310–11 (4th Cir.1999). The court held that LPNs who assigned work, directed nursing assistants, and disciplined nursing assistants, among other things, did not engage in "simply professional medical functions." *Beverly Enters., Virginia,* 165 F.3d at 297. It explained that these duties involved "decisions [that] are part and parcel of what it means to be a manager and a supervisor. Every assignment of work requires some level of expertise, but supervisors need not be ignorant of the work situation which they supervise to fall within [the Act's] definition of 'supervisor.' " *Id.* These LPNs, like those in the case before us, assigned work to CNAs, regulated their breaks, and directed them in the completion of their work. *See id.* These LPNs could also send the nursing assistants home for misbehavior, without seeking the approval of others. *See id.* In addition, they could transfer nursing assistants to different wings of the nursing home and evacuate the facility if needed. *See id.* The LPNs in the companion case also served as charge nurses. *See Beverly Enter., West Virginia,* 165 F.3d at 308–09. They assigned and directed the care of a unit according to the policies of the nursing home, participated in and supervised all care of patients, maintained the overall operation in the absence of other supervisors, and assigned and adjusted the workload of nursing assistants. *Id.* at 308–09. The Fourth Circuit concluded that under these facts, these LPNs were supervisors under the Act. *See Beverly Enters., Virginia,* 165

---

**1.** As a result of the end run around *Health Care & Retirement Corp.,* GranCare during the second Board hearing could not introduce new evidence with regard to the independent judgment prong because the factual issues had been decided and not altered directly by the Supreme Court's *Health Care & Retirement Corp.* decision. Thus, they were prohibited from introducing into evidence two key facts that provide additional support for the conclusion that LPNs in this case are supervisors. LPNs' duties regarding their evaluations of CNAs changed when GranCare began using them in determining whether CNAs receive raises. In addition, GranCare hired a new assistant director of nursing who implemented management training for LPNs to aid them in their already existing managerial duties. These specif-

ic duties merely echo the evidence already in the record demonstrating that LPNs exercise independent judgment and, thus, are supervisors.

**2.** In addition to the Fourth Circuit, at least two other circuits have similarly concluded that LPNs are supervisors. *See Mid–America Care Found.,* 148 F.3d at 641 (finding that LPNs who had the authority to direct CNAs and other personnel, mandate overtime, and fill out evaluation forms, as well as at times being the highest ranking employee on duty were supervisors); *NLRB v. Passavant Retirement & Health Ctr.,* 149 F.3d 243, 248–49 (3d Cir.1998) (finding that LPNs who had the authority to send CNAs home for flagrant violations were supervisors).

F.3d at 207–99; *Beverly Enters., West Virginia,* 165 F.3d at 310–11.

These duties parallel those of the LPNs in our case. The record establishes, through testimony as well as job descriptions, that the LPNs had the authority to assign CNA duties, the authority to reassign CNAs, the authority to determine the ratio of CNAs to patients, the authority to monitor CNAs, the authority to instruct CNAs, and the authority to discipline CNAs, by sending them home for misbehavior. In addition, the LPNs are subject to disciplinary actions for failing to monitor CNAs. CNAs are also told that they are responsible to the charge nurse, a position which all LPNs hold. (All LPNs are charge nurses, and some RNs may be charge nurses.) Among other things, CNAs must report patient behavior and conditions to the charge nurses, perform procedures the charge nurses assign and instruct them to complete, report any equipment and supply needs to the charge nurses, and practice first aid measures as instructed by the charge nurses. The bottom line is that the LPNs' duties require them to supervise the CNAs. In doing so, they, like the LPNs in the Fourth Circuit cases, must exercise the type of independent judgment associated with supervisors, regardless of their professional knowledge.

In sum, while we may owe the Board some deference, we should not review this case under the highly deferential *Chevron* standard because the Board has repeatedly and continuously acted in a manipulative manner, forfeiting its entitlement to such deference. The decision of the Board should be reviewed under a substantial evidence standard of review, and we should rely solely upon the statutory text and not secondary indicia, such as the ratio of supervisors to nonsupervisors. Upon examination of the record as a whole, substantial evidence fails to support the Board's conclusion. Rather, it demonstrates that LPNs do exercise independent judgment and, therefore, are supervisors within the meaning of the Act. I dissent.