176 F.3d 154
 161 L.R.R.M. (BNA) 2139
 NATIONAL LABOR RELATIONS BOARD, Petitioner in No. 98-6168,
v.
ATTLEBORO ASSOCIATES, LTD.; Attleboro, Inc., Individually
and as Partners d/b/a Attleboro Nursing &
Rehabilitation Center, Respondents.
Attleboro Associates, Ltd.; Attleboro, Inc., Individually
and as Partners d/b/a Attleboro Nursing &
Rehabilitation Center, Petitioners in No. 98-6211,
v.
National Labor Relations Board, Respondent.
 Nos. 98-6168, 98-6211.
 United States Court of Appeals, Third Circuit.
 Argued Feb. 19, 1999.
Filed April 30, 1999.
 
 Charles Donnelly, Supervisory Attorney, Anne Marie Lofaso (argued), Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, National Labor Relations Board, Washington, D.C., for petitioner in No. 98-6168.
 Stephen J. Cabot (argued), Maria L. Petrillo, Michael E. Lignowski, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, PA, for petitioners in No. 98-6211.
 Before: GREENBERG, LEWIS, and BRIGHT,* Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 I. INTRODUCTION
 
 1
 These proceedings for enforcement and review of orders of the National Labor Relations Board arising from a dispute over employees' representation requires us again to consider the supervisory status under section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11) ("section 2(11)"), of licensed practical nurses (LPNs) employed as charge nurses by a nursing home. In this case, the Attleboro Nursing & Rehabilitation Center ("Attleboro") in Langhorne, Pennsylvania, employs the LPNs. In Passavant Retirement & Health Ctr. v. NLRB, 149 F.3d 243 (3d Cir .1998), rejecting the contrary conclusions of the Board, we held that similarly situated LPN charge nurses were supervisors under section 2(11) so that the nursing home did not have to bargain collectively with a union representing them. Id. at 247. We likewise reject the Board's conclusions that Attleboro's LPN charge nurses are not supervisors according to section 2(11), and specifically take issue with the Board's restrictive interpretation of the term "independent judgment" with respect to the LPNs' employment responsibilities as that term is used in section 2(11).
 
 II. FACTUAL AND PROCEDURAL HISTORY
 A. Factual history
 
 2
 Attleboro operates a 180-bed nursing and rehabilitation center which is a three-floor facility that operates 24 hours per day, seven days a week. The center divides its operations into three shifts, starting at 7:00 a.m., 3:00 p.m., and 11:00 p.m. Attleboro divides its nursing department into four units: Unit One is on the first floor and has a diverse, long-term resident population of approximately 60; Unit Two, on the second floor, also has 60 beds and serves residents with dementia or dementia-related illnesses that typically require total care; Unit Three, on the third floor, has 48 beds and is devoted to short-term care Medicare patients; and Unit Four, also on the third floor, is an 11-bed subacute unit for short-term, high acuity stays. The Administrator of the facility, Kathy Krick, is responsible for its overall operation and the Director of Nursing, Kathy Delcambre, and the Assistant Director of Nursing, Cheryl Donsbach, are in charge of the nursing staff.
 
 
 3
 Attleboro employs unit managers to oversee each of the four units. The unit managers are registered nurses ("RNs"), responsible for all three shifts on their units, although they typically work only the 7:00 a.m. to 3:30 p.m. shift Monday to Friday. The unit managers deal with personnel issues, coordinate shifts that conform with the overall care plan, and ensure that the staff meets residents' needs and follows the center's policies and state regulations. Attleboro also employs shift supervisors who are RNs responsible for the center's operations during the shifts when the Unit Managers are not present. Inasmuch as state law requires the presence of an RN at the facility at all times, the center employs one shift supervisor per shift to oversee all four units.
 
 
 4
 The center employs LPNs as charge nurses, unit coordinators, and treatment nurses. LPN charge nurses administer medication, give treatment, and oversee the certified nursing assistants (CNAs), who undertake most of the direct resident care duties. LPN charge nurses ensure that CNAs complete required documentation and, in addition, respond to CNA reports of resident care issues. The LPNs collaborate with the unit managers in preparing the assignments of CNAs who do not have regular daily assignments. The non-charge nurse LPNs' duties are not relevant to this dispute.
 
 
 5
 The LPN charge nurses train new CNAs, assign them tasks, teach them to perform medical procedures, and generally supervise their work. During an emergency, an LPN will assume the responsibility for a resident's care, and may direct CNAs to perform assisting tasks. Although some CNAs who work the day-shift have regular daily assignments, LPN charge nurses coordinate with their unit managers to prepare most of the CNAs' assignments. The evening and night-shift charge nurses have more responsibility in this regard as they are the only supervisors in their units. Similarly, in the event a unit is understaffed, an LPN charge nurse may initiate the transfer of a CNA, although a unit manager or the shift supervisor makes the ultimate decision to call in unscheduled CNAs or transfer CNAs from one floor to another. The nursing staff is placed roughly as follows: each unit has a unit manager, two LPN charge nurses, and six CNAs during the first shift, and the same staffing minus the unit managers but adding one shift supervisor during the other shifts.
 
 
 6
 Attleboro's written progressive disciplinary policy provides for oral warnings, written warnings, suspensions, and discharges for various types of misconduct. LPN charge nurses initiate this process by issuing "Employee Disciplinary Notices" to CNAs. These notices provide three alternative designations, Oral Warning, 1st Written Warning or 2nd Written Warning. The notices also have spaces to record specific details, disciplinary action taken, and recommended corrective action, and bear signature lines for the "Supervisor" who prepared the form and the "Department Head." Once an LPN charge nurse completes a disciplinary notice, she passes it on to the Director of Nursing, who ensures that the discipline is at the proper step of the progressive disciplinary policy. The Director of Nursing sometimes investigates the infraction, and may meet with the LPN charge nurse or the CNA to discuss the disciplinary action.
 
 
 7
 We recognize that notwithstanding Attleboro's policy, the Board's Regional Director, in her Decision and Direction of Election, ultimately doubted the LPN charge nurses' authority to recommend discipline. Nevertheless, the Regional Director acknowledged that "[t]he record shows that disciplinary notices were, at least in part, filled out and, in some instances, signed by LPN charge nurses. Some of the notices contain recommended corrective action or indicate that the employee received oral counseling." App. at 333. The Regional Director also noted that while Attleboro authorized its LPN charge nurses to suspend a CNA immediately for a flagrant violation of policy, the LPN charge nurses who testified at the representation hearing denied knowing that they had this authority.
 
 B. Procedural history
 
 8
 The case combines two proceedings concerning the same decision of the Board. First, the Board is applying to this court for enforcement of its May 18, 1998 Decision and Order finding that Attleboro violated sections 8(a)(1) and (5) of the NLRA, 29 U.S.C. § 158(a)(1) and (5), by refusing to bargain with Teamsters Local Union No. 628 a/w International Brotherhood of Teamsters ("the Union") as the collective bargaining representative of 26 full-time and regular part-time LPNs. The second proceeding is Attleboro's Cross-Petition for Review of this Decision and Order.
 
 
 9
 The Union petitioned the Board's Regional Office for representation of LPNs on November 4, 1997. Attleboro challenged this petition at a November 20, 1997 representation hearing, arguing that Attleboro's LPN charge nurses in the proposed collective bargaining unit are "supervisors" within the meaning of section 2(11) of the Act. 29 U.S.C. § 152(11). Despite Attleboro's protests, the Regional Director found that the LPN charge nurses are not supervisors. Thus, she approved the Union's requested bargaining unit and ordered an election by her decision of January 2, 1998.
 
 
 10
 In her Decision and Direction of Election approving the Union's bargaining unit, the Regional Director began her analysis with the statement that "[t]here is no evidence that the Employer's LPN charge nurses or LPNs have the authority to discharge, transfer, lay off, recall or promote employees, or to adjust complaints or grievances. The Employer's claim of supervisory status rests on the LPN charge nurses' involvement in directing and assigning work to, issuing discipline to and completing performance evaluations of, CNAs." App. at 336.
 
 
 11
 The Regional Director then made an analysis of the assignment issue. She noted that "LPN charge nurses set, or assist in setting, daily assignments for CNAs" but indicated that "distributing daily assignments to employees whose skills are not significantly varied, or to employees with different skills whose abilities are well known, is generally routine and not supervisory." Id. Thus, she found this authority insufficient to indicate supervisory status.
 
 
 12
 The Regional Director recognized that the charge nurses' authority to recall CNAs when Attleboro was understaffed was in dispute. While Attleboro's witnesses claimed that the LPN charge nurses had the authority to require unscheduled CNAs to report for work, they also admitted that a unit manager or a higher authority ultimately would decide to call unscheduled CNAs in to work. In these circumstances, the Regional Director found that the charge nurses could not exercise this authority using independent judgment. The Regional Director likewise found that the LPN charge nurses' direction of the CNAs' duties required an LPN merely to exercise her greater skill and experience to help a less-skilled employee perform her job correctly, and thus did not require the use of independent judgment.
 
 
 13
 With respect to authority to discipline, the Regional Director stated that "there is no dispute that LPN charge nurses issue verbal and written warnings to CNAs for misconduct." Id. at 337 (emphasis added). However, she held that the charge nurses did not undertake this responsibility with the use of independent judgment because the warnings did not result in adverse action to the CNA without further review by a higher authority. Because the Director of Nurses reviewed and sometimes investigated the basis of a charge nurse's recommendation for discipline, the Regional Director concluded that the LPN charge nurses merely were serving in a "reportorial" and not supervisory capacity. Id. at 337-38.
 
 
 14
 Next, the Regional Director found that, despite Krick's and Delcambre's contrary assertions, the LPN charge nurses actually did not possess the authority to suspend employees immediately for flagrant violations. However, she held that even if they held this authority, its exercise did not confer supervisory status because the violations were so obvious that a decision to suspend would not require independent judgment. Finally, the Regional Director rejected Attleboro's arguments concerning the LPN charge nurses' evaluating or rewarding CNAs, the training charge nurses may have received, and the LPN charge nurses' job description, which described various supervisory duties.
 
 
 15
 Attleboro filed a timely request for review of this decision with the Board challenging the Regional Director's resolution of the supervisor issue. On January 30, 1998, a three-member panel of the Board summarily denied Attleboro's request with one member dissenting. The Regional Office conducted an election on that same day. The Union won the election and was certified.
 
 
 16
 However, Attleboro refused to recognize the Union, arguing that its certification was invalid because the charge nurses were supervisors under the NLRA. This refusal prompted the Union to file an unfair labor practice charge with the Board. The Board's General Counsel filed a motion for summary judgment on April 2, 1998, asking it to find that Attleboro violated sections 8(a)(1) and (5) of the NLRA by failing to bargain with the Union. On April 21, 1998, Attleboro responded by repeating its allegation about the status of its LPN charge nurses.
 
 
 17
 On May 18, 1998, the Board, with one member of the three-member panel again dissenting, granted the General Counsel's motion for summary judgment. The Board filed an Application to Enforce its Order with the court on July 10, 1998, and Attleboro filed its Cross-Petition for Review on August 3, 1998.
 
 III. DISCUSSION
 
 18
 The Board had jurisdiction over the unfair labor practice charge pursuant to sections 10(a) and (b) of the Act, 29 U.S.C. § 160(a)(b), and we have jurisdiction over the Board's Application to Enforce and Attleboro's Cross-Petition for Review pursuant to sections 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f).
 
 
 19
 The Board argues that its construction of the term "independent judgment" is reasonable and is entitled to deference and, therefore, that we should enforce its order. The Board argues that the record supports its decision rejecting Attleboro's claims that the LPN charge nurses exercise independent judgment in their authority to discipline, assign, responsibly direct, or adjust grievances, and thus are supervisors with whom Attleboro need not bargain collectively. Moreover, the Board contends that Attleboro waived the grievance issue by failing to raise it below.
 
 A. Standard of review
 
 20
 We exercise deferential review over a decision of the Board. See Passavant, 149 F.3d at 246; Tubari Ltd., Inc. v. NLRB, 959 F.2d 451, 453 (3d Cir.1992). Specifically, we review its findings of fact to determine if they are supported by substantial evidence in the record as a whole, but exercise plenary review over questions of law and the Board's application of legal precepts. See NLRB v. Public Serv. Elec. and Gas Co., 157 F.3d 222, 228-30 (3d Cir.1998); Passavant, 149 F.3d at 246. Accordingly, although we give deference to the Board's interpretation of the NLRA, we are not "at liberty to ignore our own jurisprudence, which dictates our decision." Id. at 249. Finally, we note that some courts recently have expressed an unwillingness to defer to the Board's interpretation of section 2(11) because they perceive it has been mishandling the supervisor issue. For example, the Court of Appeals for the Second Circuit recently applied a more probing review to a case where the Board did not find supervisory status:
 
 
 21
 [T]he Board's biased mishandling of cases involving supervisors increasingly has called into question our obeisance to the Board's decisions in this area. See, e.g., NLRB v. Winnebago Television Corp., 75 F.3d 1208, 1214 (7th Cir.1996); Schnuck Markets, Inc., v. NLRB, 961 F.2d 700, 704 (8th Cir.1992); Children's Habilitation Center, Inc. v. NLRB, 887 F.2d 130, 132 (7th Cir.1989); NLRB v. Res-Care, Inc., 705 F.2d 1461, 1466 (7th Cir.1983); NLRB v. St. Mary's Home, Inc., 690 F.2d 1062, 1067 (4th Cir.1982).
 
 
 22
 Recognizing that the NLRB earns and forfeits deferential judicial review by its performance, Children's Habilitation, supra, 887 F.2d at 132, the above-cited cases hold in substance that the Board's manipulation of the definition of supervisor has reduced the deference that otherwise would be accorded its holdings. See also NLRB v. Porta Sys. Corp., 625 F.2d 399, 405 (2d Cir.1980) (Van Graafeiland, J., concurring in part and dissenting in part) (challenging the "result-oriented" method of determining supervisory status).
 
 
 23
 Spentonbush/Red Star Cos. v. NLRB, 106 F.3d 484, 492 (2d Cir.1997).
 
 
 24
 Thus, while we note that we normally accord deference to the Board when reviewing its interpretations of the NLRA, we also recognize that the Board's recent decisions have caused some courts to question its adjudications. However, we see no need to reduce the deference that we normally afford the Board, as we find the Board's interpretation of "independent judgment" inconsistent with the NLRA under the traditional deferential standard of review, see NLRB v. Health Care & Retirement Corp. of Am., 511 U.S. 571, 576, 114 S.Ct. 1778, 1781-82, 128 L.Ed.2d 586 (1994), and its application of the term to the circumstances of this case erroneous as a matter of law. See Passavant, 149 F.3d at 246.
 
 B. Legal background
 
 25
 A dispute over the supervisory status of LPN charge nurses is not a new subject. In fact, the Supreme Court spoke on the issue fairly recently in Health Care, 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586, and we rendered a decision in circumstances similar to those here in Passavant, 149 F.3d 243. Thus, we begin our analysis by considering these two cases before reaching the specifics of the Regional Director's decision. We then will consider opinions of other courts of appeals.
 
 
 26
 The issue before the Supreme Court in Health Care was whether the Board's interpretation of section 2(11)[1] that a "nurse's supervisory activity is not exercised in the interest of the employer if it is incidental to the treatment of patients" was rational and consistent with the NLRA. 511 U.S. at 576, 114 S.Ct. at 1781-82. The Court held that it was not. Id., 114 S.Ct. at 1781-82. It reasoned that "[p]atient care is the business of a nursing home, and it follows that attending to the needs of the nursing home patients, who are the employer's customers, is in the interest of the employer." Id. at 577, 114 S.Ct. at 1782. Significantly, for our purposes, the Court said the following with respect to the Board's argument that it should not read "in the interest of the employer" in section 2(11) to override the protections of the NLRA for professional employees:
 
 
 27
 The Act does not distinguish professional employees from other employees for purposes of the definition of supervisor in § 2(11). The supervisor exclusion applies to 'any individual' meeting the statutory requirements, not to 'any non-professional employee.' ... To be sure, as recognized in [NLRB v. Yeshiva Univ., 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980) ], there may be 'some tension between the Act's exclusion of [supervisory and] managerial employees and its inclusion of professionals,' but we find no authority for 'suggesting that that tension can be resolved' by distorting the statutory language in the manner proposed by the Board.
 
 
 28
 Id. at 581, 114 S.Ct. at 1784 (quoting Yeshiva, 444 U.S. at 683-86, 100 S.Ct. at 862-64). The Court, however, did recognize (but neither endorsed, nor criticized) that the Board sometimes has made decisions based upon the "distinction between authority arising from professional knowledge and authority encompassing front-line management prerogatives." Id. at 583, 114 S.Ct. at 1785.[2]
 
 
 29
 While Health Care concerned the Board's interpretation of the "in the interest of the employer" prong of the section 2(11) test,[3] we interpreted the "independent judgment" prong in Passavant, 149 F.3d at 247 ("[T]he Board has come to lean heavily upon the question of nurses' independent judgment to determine their supervisory status.").[4] We held that the LPN charge nurses at issue there "exhibit[ed] two of the twelve possible statutory criteria of a supervisor, i.e., disciplinary authority and adjustment of grievances, and that those attributes were exercised using independent judgment, and in the interests of the employer." Id.
 
 
 30
 The Board had recognized in Passavant that the employer's charge nurses possessed the authority to suspend CNAs for "flagrant conduct violations, such as resident abuse." Id. at 248. This recognition led us to conclude that the LPN charge nurses had the authority to discipline. Id. Relying on Warner Co. v. NLRB, 365 F.2d 435, 439 (3d Cir.1966), we rejected the Board's argument that independent judgment is not involved in exercising this authority because "the offenses are obvious violations of the Employer's policies and speak for themselves." Id. at 248-49. We stated that "this type of dismissal could not be considered a routine or clerical function; it consists of a Charge Nurse imposing her independent judgment upon, and exercising her authority over a subordinate, however subtle or flagrant the violation." Id. at 249.
 
 
 31
 The Board also had recognized that the charge nurses could "resolve minor problems or 'gripes' raised by [nurses aides] and resident assistants concerning daily assignments, break time[s] and the like, but were not involved in the formal grievance procedure." Id. at 248. Thus, we recognized that the Board "implicitly reasoned that resolving 'gripes' does not rise to the level of adjusting grievances under the NLRA." Id. However, again relying on Warner, 365 F.2d at 438, we rejected this reasoning, and held that the resolving of small complaints by the nurses aides and resident assistants indicates that the LPN charge nurses had the authority to adjust the aides' grievances to meet the statutory "supervisory" criterion. Id. We held that Warner also compelled the conclusion that this authority to adjust grievances entailed the use of independent judgment. Id. at 249.
 
 
 32
 As an additional background matter, we note that there is a split among the courts of appeals concerning whether the Board's interpretation of "independent judgment" in LPN charge nurses cases is a reasonable construction of the NLRA. Our decision in Passavant rejecting the Board's application of its interpretation of "independent judgment" to conclude that LPN charge nurses were not supervisors under section 2(11) is consistent with decisions of the Court of Appeals for the Fourth Circuit, Beverly Enters., W. Va., Inc. v. NLRB, 165 F.3d 307 (4th Cir.1999) (en banc), and Beverly Enters., Va., Inc. v. NLRB, 165 F.3d 290 (4th Cir.1999) (en banc), and the Sixth Circuit, Caremore, Inc. v. NLRB, 129 F.3d 365 (6th Cir.1997). However, four courts of appeals have reached contrary conclusions. See Beverly Enters.-Mass., Inc. v. NLRB, 165 F.3d 960 (D.C.Cir.1999); NLRB v. Grancare, Inc., 170 F.3d 662 (7th Cir.1999); Beverly Enters., Minn., Inc. v. NLRB, 148 F.3d 1042 (8th Cir.1998); Providence Alaska Med. Ctr. v. NLRB, 121 F.3d 548 (9th Cir.1997). Of course, resolution of the question of whether a charge nurse exercises independent judgment is inherently factual in nature, although the cases suggest that similar organizational structures exist throughout the nursing home industry.[5]
 
 
 33
 Turning to the matter at hand, while it is clear that Attleboro must show only that its LPN charge nurses perform one of section 2(11)'s 12 enumerated duties to support a finding of supervisory status, see Passavant, 149 F.3d at 247, we find that Attleboro's LPN charge nurses perform four such duties in that while exercising independent judgment they recommend discipline, adjust grievances, assign CNAs, and responsibly direct CNAs.
 
 C. The authority to recommend discipline[6]
 
 34
 The Regional Director, in her Decision and Direction of Election, recognized that the LPN charge nurses at Attleboro issue verbal and written warnings to CNAs for misconduct. However, she determined that because the Director of Nurses reviewed the recommendations and sometimes would investigate an incident before acting upon a recommendation, the charge nurses did not exercise independent judgment in recommending disciplinary action. We hold this application of the term "independent judgment" to the facts of this case erroneous as a matter of law.
 
 
 35
 In Glenmark, the Court of Appeals for the Fourth Circuit held, in similar circumstances, that the decision to counsel orally or write up a CNA requires an LPN charge nurse to use independent judgment. 147 F.3d at 342, 344. That case concerned two separate nursing homes, Cedar Ridge and Point Pleasant.[7] Id. at 335. Cedar Ridge's LPN charge nurses had the authority to counsel a CNA for minor infractions, file a written "verbal correction notice" with the Director of Nursing, or take both actions.[8] Glenmark, 147 F.3d at 336. The court rejected the Board's finding that the "verbal correction reports ... were not independent exercises of disciplinary authority because the LPNs did not have the final word on what disciplinary action would be taken against the CNAs." Id. at 342. The court reasoned that inasmuch as section 2(11) requires only that a supervisor have the authority "effectively to recommend ... discipline," the "relevant consideration is effective recommendation or control rather than final authority." Id. (quoting Yeshiva, 444 U.S. at 684 n. 17, 100 S.Ct. at 863 n. 17). Accord Caremore, 129 F.3d at 369-70 (rejecting the Board's argument that LPN charge nurses did not effectively recommend discipline because their recommendations were subject to review by a higher authority).
 
 
 36
 Furthermore, the court recognized that the NLRA does not preclude a charge nurse from having supervisory status merely because her recommendation is subject to a superior's investigation. Id. (citing ITT Lighting Fixtures v. NLRB, 712 F.2d 40, 45 (2d Cir.1983)).[9] Speaking specifically on the independent judgment issue, the court stated that because an LPN could choose to counsel a CNA orally, or file a verbal correction report, she was making an independent judgment about whether the infraction was severe enough to bring it to the Director of Nursing's attention. Glenmark, 147 F.3d at 342-43.
 
 
 37
 Point Pleasant's collective bargaining agreement provided for a progressive disciplinary process. Id. at 337. The first step was verbal counseling documented by a verbal correction report. Id. The second directed the LPN to issue a written warning. Id. The third was suspension without pay, and the final step, discharge. Id. LPNs completed the first step of the process by filing verbal correction reports. Id. The court held that the Board's position that Point Pleasant's LPNs effectively did not recommend discipline using independent judgment was "even less tenable ... than it was at Cedar Ridge." Id. at 344. The court reasoned that inasmuch as the LPNs' verbal correction report initiates the disciplinary process and becomes part of the CNA's personnel file, an LPN's decision to issue the report was a recommendation to discipline requiring the LPN's independent judgment. Id. The court held that because the LPN's filing a report would lead to more serious discipline with the next infraction, the filing was "more than the recommendation of discipline ... [but was] in itself a disciplinary action." Id.
 
 
 38
 The situation at Attleboro is a hybrid of those of the nursing homes in Glenmark. While Attleboro's LPNs expressed ignorance as to their ability to suspend a CNA for flagrant misconduct, their authority and practice of orally counseling and writing up CNAs for other infractions is undisputed. This ability, according to Glenmark, constitutes effectively recommending discipline, and in fact may be "itself a disciplinary action," inasmuch as Attleboro employs a progressive disciplinary process similar to Point Pleasant's.
 
 
 39
 The situations described in the opinions of the Courts of Appeals for the Eighth and District of Columbia Circuits, to the extent that they find an LPN charge nurse's authority to recommend discipline insufficient to establish supervisory status, are distinguishable from the one at hand. First, in Beverly Enterprises, Minn., 148 F.3d 1042, the court of appeals found determinative the fact that the LPN charge nurses' disciplinary authority consisted "solely of the power to verbally reprimand [nursing assistants]." Id. at 1046. Moreover, the court found that the charge nurses were not "an integral part of the disciplinary process" and "play[ed] no role in determining whether an employee is disciplined or in determining the type of discipline to be imposed." Id. The circumstances clearly are different here inasmuch as Attleboro's charge nurses initiate a progressive disciplinary process, and their decisions to write up a CNA become a permanent part of the CNA's personnel file and could lead to the CNA's termination.
 
 
 40
 Second, in Beverly Enterprises-Mass., 165 F.3d 960, the court of appeals upheld the Board's finding that although the nursing home had instructed the LPN charge nurses that they had "independent authority to discipline," the record did not reveal any instances where a charge nurse exercised this authority. Id. at 961. Here, however, the Regional Director's decision recognized that "[t]he record shows that disciplinary notices were, at least in part, filled out and, in some instances, signed by LPN charge nurses" and that some of these notices "contain[ed] recommended corrective action or indicate[d] that the employee received oral counseling." App. at 333.
 
 
 41
 Thus, we hold that because Attleboro's LPN charge nurses make a decision to counsel an offending CNA directly, or initiate a progressive disciplinary process that becomes part of a CNA's permanent personnel file and could lead to her termination, the charge nurses effectively recommend discipline using independent judgment within the meaning of section 2(11). Consequently, they are supervisors for this reason alone. Thus, an acceptance of the Board's reading of the NLRA in this case "would ... render the statutory phrase 'effectively to recommend' nugatory." Caremore, 129 F.3d at 370.
 
 D. The authority to adjust grievances
 
 42
 The Regional Director concluded that Attleboro presented no evidence that its LPN charge nurses have the authority to adjust "complaints or grievances." According to the Board, this fact, combined with Attleboro's failure to raise the issue in its brief requesting that the Board review the Regional Director's decision, constitutes a waiver of this argument. We find, however, that Attleboro sufficiently raised the issue by adducing testimony concerning this authority during the representation hearing before the Regional Director and requesting that the Board withdraw its Petition to Enforce in light of our decision in Passavant. Moreover, the Regional Director's decision reveals that she considered the issue and made a factual finding that the charge nurses did not have this authority. On the merits, we find that the Regional Director's conclusion that the charge nurses did not possess the authority to adjust grievances unsupported by substantial evidence in the record as a whole.
 
 
 43
 First, contrary to the Board's factual assertions, the record contains unrebutted evidence that LPN charge nurses have the authority to adjust grievances and do so using independent judgment. At the representation hearing, Krick testified that two arguing CNAs would go to their LPN charge nurse to solve their dispute. Krick testified further that typical disputes between CNAs included the specifics of work assignments and whether they performed their work satisfactorily. Similarly, Attleboro's counsel asked Delcambre "do the LPNs have the authority to adjust grievances between CNAs--adjust disputes between CNAs?" App. at 155. Delcambre responded, "[t]wo CNAs that are arguing, yes." Id. We hold that this unrebutted testimony establishes that LPN charge nurses have the authority to adjust grievances between CNAs, and that the Regional Director's contrary decision is not supported by substantial evidence in the record as a whole.
 
 
 44
 Furthermore, our decision in Passavant demonstrates that the LPNs exercise this authority using independent judgment. In Passavant, we rejected the Board's conclusion that the LPN charge nurses did not adjust grievances using independent judgment because they had the power only to "resolve minor problems or 'gripes' raised by [nurses aides] and resident assistants concerning daily assignments, break time[s] and the like." 149 F.3d at 248. Instead, we held that "the adjustment of even minor grievances is enough to support a finding of supervisory authority...." Id. Inasmuch as the Board does not provide a basis for us to decline to find Passavant controlling in this instance, we hold that Attleboro's LPN charge nurses' authority to adjust even minor grievances using independent judgment requires a finding that they have supervisory status.
 
 E. The authority to assign and direct CNAs
 
 45
 The Regional Director stated that Attleboro's LPN charge nurses "set, or assist in setting, daily assignments for CNAs," and held general supervisory authority over the CNAs' duties, while she found that the LPNs did not exercise the authority to initiate or request transfers or require an off-duty CNA to report to work when a unit is understaffed. Accepting her factual findings, we hold that in determining that LPN charge nurses do not exercise independent judgment in setting daily assignments or directing the CNAs in their daily duties, the Regional Director erroneously applied the "independent judgment" criterion to the facts of this case.
 
 
 46
 The Board argues that the assigning of tasks and general supervision of a CNA's daily tasks is "routine" and entails "nothing more than the exercise of the LPNs' greater skill and expertise in helping a less skilled employee perform a job correctly ." Brief at 26. However, we join the Court of Appeals for the Fourth Circuit in Glenmark in rejecting this argument. The Glenmark court stated that decisions to assign workers are "inseverable from the exercise of independent judgment, especially in the health care context where staffing decisions can have such an important impact on patient health and well-being." 147 F.3d at 342. Moreover, as is the situation here, the charge nurses in Glenmark possessed the power to reorganize the schedule or request additional CNAs in case of an emergency. Id. at 342, 343. This power, by itself, shows that an LPN charge nurse exercises her authority to assign and direct by using independent judgment. Id.
 
 
 47
 The Board's misapplication of the perceived distinction between "professional" and "supervisory" underlies its erroneous legal conclusions concerning the assigning and directing of CNAs. This distinction is inherent in the NLRA's exclusion of supervisors from its coverage while including professionals.[10] The Board characterizes this distinction as follows:
 
 
 48
 It is consistent with the general rule that direction of other employees on the basis of superior training, experience or skill does not establish supervisory status.... Accordingly, the LPN charge nurses do not exercise independent judgment in assigning or responsibly directing CNAs. Their role in those areas is, at most, routine, in that they either have no discretion or exercise only professional judgment.
 
 
 49
 Brief at 9. The Board claims that this approach is reasonable and consistent with the NLRA because it
 
 
 50
 reasonably harmonizes Congress' intent both to exclude supervisors from the Act and to include statutorily defined professional employees within the class of covered employees.... Because many professionals have the authority to direct the work of other employees, broadly defining 'independent judgment' to include every exercise of professional discretion in directing less skilled employees would severely curtail the organizational rights of professionals.
 
 
 51
 Id. at 14-15 (citations omitted). Moreover, the Board points out that the Supreme Court did not disapprove of the use of this distinction in deciding section 2(11) status in Health Care.
 
 
 52
 While the Board's interest in protecting the organizational rights of professionals is appropriate, the Supreme Court noted in Health Care that the NLRA "does not distinguish professional employees from other employees for purposes of the definition of supervisor in § 2(11)." 511 U.S. at 581, 114 S.Ct. at 1784. And, while it did not disapprove of the Board's professional/supervisor dichotomy, the Court did not approve of it either. Id. at 583, 114 S.Ct. at 1785. In fact, the Court admonished the Board that while it recognized the inherent tension in excluding supervisors from collective bargaining but including professionals, it could "find no authority for 'suggesting that that tension can be resolved' by distorting the statutory language" of the NLRA. Id. at 581, 114 S.Ct. at 1784 (quoting Yeshiva, 444 U.S. at 686, 100 S.Ct. at 864).
 
 
 53
 Furthermore, the distinction may be a false dichotomy intended to avoid the Supreme Court's rejection of the "patient care" dichotomy in Health Care. For example, a recent commentator characterized the Court of Appeals for the Ninth Circuit's adoption of the Board's position in Providence, 121 F.3d 548, as follows:
 
 
 54
 Although the Board followed the Supreme Court's holding [in Health Care ] and seemingly dispensed with its 'patient care' analysis, ... the Board in substance has done nothing more than create a new false dichotomy dependent upon 'patient care' analysis.... In Providence Hospital the Board chose to draw a distinction between the 'expert judgment' exercised by professionals, and the 'independent judgment' used by supervisors. In essence, this distinction is nothing more than an attempt to resurrect the Board's 'patient care' analysis, which created a false dichotomy between performing an activity 'in the interest of a patient' and performing it 'in the interest of an employer.'
 
 
 55
 G. Roger King, Where Have All the Supervisors Gone?--The Board's Misdiagnosis of Health Care & Retirement Corp., 13 Lab.Law. 343, 352 (1997).
 
 
 56
 Similarly, Judge Noonan, dissenting in Providence, in our view correctly characterized the court's application of the distinction, as "in effect declar [ing] that a professional who is supervising other professionals cannot be a supervisor." 121 F.3d at 556. Judge Noonan summarized the irrationality of applying the distinction there by pointing out that it leaves no room for situations where an employee exercises both "professional" and "supervisory" independent judgment:
 
 
 57
 What do the charge nurses do? At the beginning of each shift they assign patients to nurses. To do so the charge nurse considers the needs of the patient, the skills of the staff and the experience of the staff members available. Of course that assignment requires professional judgment. Of course that assignment requires independent judgment.... That the charge nurse in exercising this judgment may call on the experience and skill she has accumulated in her regular role as a nurse does not for a moment make the judgment she uses less than independent.
 
 
 58
 Id.
 
 
 59
 Judge Noonan's criticism is supported by the Supreme Court's observation that "professionals, like other employees, may be exempted from coverage under the Act's exclusion for 'supervisors' who use independent judgment in overseeing other employees in the interest of the employer...." Yeshiva, 444 U.S. at 681-82, 100 S.Ct. at 862. Consequently, it is impossible to comprehend how a nurse's status as a professional employee negates her status as a supervisor. Yet, this is the reading of the NLRA that the Board would have us apply to balance the tension caused by the NLRA's exclusion of supervisors and inclusion of professionals in the collective bargaining process.
 
 
 60
 While we recognize that in some situations a professional employee may be exercising the "discretion and judgment" of section 2(12)'s definition of a professional and therefore not be exercising "independent judgment" according to section 2(11), that is not the situation here. There is an obvious distinction between exercising independent judgment or acquired skill in completing a task, on the one hand, and using independent judgment in performing one of the 12 section 2(11) tasks, on the other. As the Court of Appeals for the Fourth Circuit noted in Beverly Enterprises, Va., 165 F.3d 290, "when an employer grants to an employee the authority to use judgment in the management or evaluation of other employees, that judgment is independent judgment under the NLRA, not the exercise of professional expertise." Id. at 295. The court continued:
 
 
 61
 [C]ontrary to the position taken by the Board, the decisions that the charge nurses make are management decisions, not ones related solely to a nurse's professional expertise. The Board would collapse the distinction between management prerogatives and professional knowledge. But the assignment of work, direction of nursing assistants, discipline of nursing assistants, and similar duties are not simply professional medical functions. Rather, such decisions are part and parcel of what it means to be a manager and a supervisor.
 
 
 62
 Id. at 298.
 
 
 63
 The situation is the same here. While it is true that LPN charge nurses have more training and skill than the CNAs, they do not assign and direct the CNAs merely because they are more knowledgable nurses who are correcting the mistakes of the less-skilled CNAs. Instead, the charge nurses assign and direct the CNAs because they hold a superior rank to them and are entrusted by Attleboro to ensure the quality of care that residents receive. These are supervisory functions, which require supervisory judgment, and indicate the epitome of supervisory authority. Thus, we find the Board's distinction between "professional" and "supervisory" employees inapplicable here. The fact is that a professional employee, just like a nonprofessional employee, may or may not be a supervisor. The LPNs here are supervisors.
 
 
 64
 Furthermore, although we agree with Judge Noonan's dissenting opinion in Providence, we note that our decision here can be distinguished from the majority's specific holding in that case.[11] The charge nurses in Providence were RNs with the authority to assign the work of other RNs. 121 F.3d at 552. In agreeing with the Board's conclusion that the charge nurses were not supervisors under the NLRA, the court found that
 
 
 65
 the record indicates the Providence charge nurses are, in many ways, 'one of the gang' with the RNs on their shift.... Both staff RNs and charge nurses evaluate one another, intervene in problem situations, and make entries on the end-of-shift report. In addition, the charge nurse on a particular shift may be a staff RN on another shift.
 
 
 66
 Id. (citations omitted). The court also found that Providence's charge nurses had "little" involvement in actually directing the staff RNs in their duties. Id.
 
 
 67
 Here, however, the LPN charge nurses are not "one of the gang" with the CNAs. Conversely, they possess and exercise the authority to assign and direct CNAs within their unit and are responsible to Attleboro for ensuring that CNAs are completing their duties effectively and residents are receiving the proper care.
 
 IV. CONCLUSION
 
 68
 For the foregoing reasons, we find that Attleboro's LPN charge nurses, using independent judgment, exercise the authority to recommend discipline, adjust grievances, and assign and direct CNAs. Under these circumstances, we hold that the LPN charge nurses are supervisors according to the terms of section 2(11), and accordingly we will grant Attleboro's Petition for Review, reverse the Board's Order, and deny the Board's Petition to Enforce.
 
 
 69
 BRIGHT, Circuit Judge, dissenting.
 
 
 70
 I dissent.
 
 
 71
 The limited direction that licensed practical nurses ("LPNs") give to certified nursing assistants ("CNAs") does not constitute supervisory authority. These tasks as shown by the record in this case can be described as routine and mundane and do not amount to the exercise of "independent judgment" as required for LPNs to qualify as supervisors.
 
 I. STATUTORY BACKGROUND
 
 72
 Section 2(11) of the National Labor Relations Act ("NLRA") defines a supervisor as:
 
 
 73
 any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 74
 29 U.S.C. § 152(11) (1998) (emphasis added).
 
 
 75
 We need to resolve two related questions: (1) What is "independent judgment" under the Act? (2) Do the Attleboro LPNs exercise that "independent judgment" in their relationship with the CNAs in this case? We turn to a discussion of these topics.
 
 
 76
 For the position of the Board in this case, we rely on the Board's brief and the Decision and Direction of Election of the Regional Director.[1] The Regional Director wrote:
 
 
 77
 LPN charge nurses direct the CNAs' duties that are generally routine in nature, consisting of little more than assisting residents in their daily living activities. They teach them to perform procedures and monitor them to ensure that an acceptable level of care and that the required documentation is completed. The Board has specifically held that an LPN charge nurse does not utilize independent judgment when she directs CNAs in routine, day-to-day care of patients because her action entails "nothing more than the exercise of the LPN's greater skill and experience in helping a less skilled employee perform her job correctly." I find that the LPN charge nurses' assignment to, and direction of, CNAs in the performance of routine functions is not indicative of supervisory status within the meaning of Section 2(11) of the Act.
 
 
 78
 App. at 337 (quoting Northern Montana Health Care Ctr., 324 NLRB No. 123, slip op. at 2, 1997 WL 650951 (1997)) (additional citations omitted).
 
 
 79
 In essence, the Board's brief echoes this interpretation. The Board summarized its position with the following Supreme Court quote:
 
 
 80
 The Board has recognized that employees whose decisionmaking is limited to the routine discharge of professional duties in projects to which they have been assigned cannot be excluded from coverage even if union membership arguably may involve some divided loyalty. Only if an employee's activities fall outside the scope of the duties routinely performed by similarly situated professionals will he be found aligned with management.
 
 
 81
 NLRB Br. at 17-18 (quoting NLRB v. Yeshiva Univ., 444 U.S. 672, 690, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980)). In other words, the Board concludes that the "discharge of duties involving professional judgment and discretion may nonetheless be 'routine' within the meaning of Section 2(11)" and not the exercise of "independent judgment." NLRB Br. at 18.
 
 
 82
 More recently the Seventh Circuit has approved of the Board's view of the term "independent judgment."
 
 
 83
 It seems that in comparable post-[Health Care ] LPN-as[-]supervisor cases around the country the Board is generally concluding that the supervisory authority typically exercised by LPNs over CNAs is not exercised with "independent judgment" as contemplated by § 2(11). Specifically, the Board has taken the position that the "judgment" of LPNs in exercising their incidental supervisory authority over CNAs is not the "independent judgment" concerned with management prerogatives contemplated by § 2(11). Rather, it is more properly viewed as "professional judgment" exercised in getting their assigned work done with the assistance of CNAs employed for that purpose. It seems to us that, given the nature of the LPN charge nurses' primary work activity and incidental supervisory function in the classic pattern of these cases, the Board's construction of "independent judgment" for application to them cannot be declared "arbitrary [or] capricious" under the APA. We think it is a permissible construction of an ambiguous term entitled to deference under Chevron.
 
 
 84
 NLRB v. Grancare, Inc., 170 F.3d 662, 668 (7th Cir.1999) (en banc).
 
 
 85
 The approval of the Board's view of "independent judgment" is supported by the D.C. Circuit in Beverly Enters.-Mass., Inc. v. NLRB, 165 F.3d 960 (D.C.Cir.1999); the Eighth Circuit in Beverly Enters., Minn., Inc. v. NLRB, 148 F.3d 1042 (8th Cir.1998); and the Ninth Circuit in Providence Alaska Med. Ctr. v. NLRB, 121 F.3d 548 (9th Cir.1997). The majority rejects this interpretation and gives the term "independent judgment" an expansive reading, so that routine decisions made by LPNs qualify as the exercise of independent judgment. The majority's position on this issue receives support from the Fourth Circuit in Beverly Enters., Va., Inc. v. NLRB, 165 F.3d 290 (4th Cir.1999) (en banc) and the Sixth Circuit in Caremore, Inc. v. NLRB, 129 F.3d 365 (6th Cir.1997). The prior case in this circuit regarding this subject did not define "independent judgment" but based on the Board's findings in that case determined that the LPNs were supervisors and that they exercised independent judgment in relation to discipline and resolving grievances of CNAs. Passavant Retirement & Health Ctr. v. NLRB, 149 F.3d 243, 247-49 (3d Cir.1998).
 
 
 86
 I believe we are obligated to apply the Board's construction of "independent judgment." Under the Administrative Procedure Act, this court must give deference to the Board's construction of "independent judgment" unless the construction is arbitrary or capricious. See 5 U.S.C. § 706 (1996). The Seventh Circuit in Grancare, 170 F.3d at 665-66, stated that courts "owe the Board deference when it is involved in the construction of an ambiguous provision of a statute it must enforce. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). And the Supreme Court characterized the term 'independent judgment' in the statute (§ 2(11)) as ambiguous in [Health Care ], 511 U.S. at 579, 114 S.Ct. 1778. In addition, reviewing courts must respect the judgment of the NLRB when it has chosen between reasonable interpretations, "even if the issue 'with nearly equal reason [might] be resolved one way rather than another.' " Holly Farms Corp. v. NLRB, 517 U.S. 392, 399, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996) (quoting Bayside Enters., Inc. v. NLRB, 429 U.S. 298, 302, 97 S.Ct. 576, 50 L.Ed.2d 494 (1977)) (alteration in original).
 
 
 87
 The legislative history of the Act supports an interpretation that appropriately distinguishes between true supervisors, with "genuine management prerogatives" owing management undivided loyalty, and "straw bosses," "leadmen," and employees possessing only minor supervisory authority. NLRB v. Health Care & Retirement Corp. of America, 511 U.S. 571, 586-89, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994) (Ginsburg, J., dissenting) (citing S.Rep. No. 105, 80th Cong., 1st Sess., 19 (1947)). Furthermore, the Supreme Court cautions that "reviewing courts must take care to assure that exemptions from NLRA coverage are not so expansively interpreted as to deny protection to workers the Act was designed to reach." Holly Farms, 517 U.S. at 399, 116 S.Ct. 1396.
 
 
 88
 This court's opinion in Passavant does not require an interpretation contrary to the Board's interpretation. Although we concluded in Passavant that under the facts and proceedings in that case that the LPNs qualified as supervisors, we cautioned that the court had not "creat[ed] a per se rule that LPNs are supervisors." Passavant, 149 F.3d at 249. Rather, "[e]ach case requires a detailed factual application of the twelve statutory criteria." Id.
 
 
 89
 The majority concludes that Attleboro's LPN charge nurses exercise supervisory authority in connection with four of the statutory criteria--discipline, adjustment of grievances, assignment, and responsibly direct CNAs--and that such authority entails the use of independent judgment. I disagree that the record in this case requires that conclusion.
 
 II. STATUTORY SUPERVISORY CRITERIA
 A. Discipline
 
 90
 The majority concludes that the Attleboro LPNs have the authority to recommend discipline utilizing independent judgment because the LPNs may issue verbal and written warnings to CNAs for misconduct. The evidence discloses that the LPN charge nurses do not exercise independent judgment in recommending discipline because Attleboro limits their role to only reporting misconduct by CNAs.
 
 
 91
 The LPNs routinely issue warnings simply to provide their supervisors, the decision-makers, with a basis to determine whether a CNA should be disciplined and what type of discipline should be imposed. Each of the disciplinary documents in the record demonstrated that the "discipline imposed on the CNA was directed or authorized by a Unit Manager, Shift Supervisor, DON [Director of Nursing], or ADON [Assistant Director of Nursing]." App. at 337. None of the employee disciplinary notices submitted as evidence by Attleboro showed that an LPN had recommended a particular discipline in the portion of the form entitled "Recommended Corrective Action." Instead, the LPNs merely restated the disciplinary issue, and stated that they referred the matter to the DON or that the CNAs should follow the procedures and regulations of Attleboro.
 
 
 92
 When faced with similar facts, the Eighth Circuit in Beverly Enters., Minn., Inc. v. NLRB, 148 F.3d 1042 (8th Cir.1998), concluded that Beverly Enterprise's LPN charge nurses did not work as supervisors.
 
 
 93
 The disciplinary authority contemplated by section 2(11) exists only where an employee exercises independent judgment in prescribing a particular discipline or in recommending that one be prescribed. Here, the nurses are not an integral part of the disciplinary process. They play no role in determining whether an employee is disciplined or in determining the type of discipline to be imposed. Instead, their role is limited to a reporting function and does not require the use of independent judgment. "[T]he mere reporting of facts is not enough to make the reporter a supervisor."
 
 
 94
 Beverly Enters., Minn., 148 F.3d at 1046 (quoting Highland Superstores, Inc. v. NLRB, 927 F.2d 918, 922 (6th Cir.1991)).
 
 
 95
 The minor supervisory role performed by the LPNs in the disciplinary process does not amount to a recommendation of discipline utilizing independent judgment. Instead, the issuance of oral and written warnings by the LPNs constitutes the use of routine judgment. The LPNs issue warnings when told to do so by their superiors or in the context of reporting a problem to their superiors. Substantial evidence supports the Regional Director's conclusion that "[i]n preparing the disciplinary notices for review by conceded supervisory personnel, the LPN charge nurses merely serve in a reportorial capacity and is thus an insufficient basis to show supervisory status." App. at 337-38.
 
 B. Authority to Adjudicate Grievances
 
 96
 The majority claims that unrebutted evidence supports the conclusion that Attleboro's LPN charge nurses possess the authority to adjust grievances. The evidence does not support the conclusion that the LPNs have the authority to adjust grievances utilizing independent judgment. Attleboro's nursing home administrator Kathleen Krick testified that the LPNs can take care of grievances concerning "who has what assignment for the shift" and "whether or not work performance was completed." App. at 87. When asked the question "do the LPNs have the authority to adjust grievances between CNAs--adjust disputes between CNAs[,]" DON Delcambre responded, "[t]wo CNAs that are arguing, yes." App. at 155. That answer does not clearly answer the question asked. It would not be unusual for one worker to settle an argument among other co-workers. The record does not indicate what type of argument an LPN can or does resolve.
 
 
 97
 I note that the LPN job description does not include the authority to adjust grievances between CNAs. App. at 276-77. Because Dave Johnson, the scheduling coordinator, directs weekly assignments, employees could readily resolve disputes over assignments by referring to the weekly assignment and schedule. In addition, LPN Mohollen testified that her unit manager would resolve conflicts regarding CNA assignment. App. at 208. The remaining grievance adjustment by LPNs relates to work completion by CNAs. Deciding whether a CNA has completed work such as distribution of lunches entails routine decisionmaking, not an exercise of independent judgment.
 
 
 98
 The majority relies upon this court's conclusion in Passavant that the resolution of minor disputes between CNAs required the use of independent judgment. Passavant, 149 F.3d at 248-49. In Passavant, this court accepted the factual findings of the Board but rejected the Board's legal determinations based on the findings. Id. at 249. The Board in Passavant found that the LPNs had the ability to adjust grievances concerning assignments, break times, and lunch breaks under a collective bargaining agreement that defined "grievance" broadly. Id. at 248. In this case, the evidence only shows that LPNs can adjust a complaint regarding whether a CNA has completed her work. This type of minor dispute is distinguishable from the disputes handled by the LPNs in Passavant.[2]
 
 
 99
 Substantial evidence supports the Board's conclusion that the LPNs do not use independent judgment to adjudge grievances. The facts of this case show that designated supervisors at Attleboro address grievances by CNAs concerning issues like assignments, scheduling and breaks. See App. at 332.
 
 C. Authority to Assign and Direct CNAs
 
 100
 The majority concludes that the LPNs possess and exercise the authority to assign and direct CNAs utilizing independent judgment. However, the LPNs have only limited assignment authority and give only routine direction using professional judgment.
 
 
 101
 In determining whether the LPNs at Attleboro exercise independent judgment in assigning and directing CNAs, the majority relies upon the Fourth Circuit case Glenmark Assocs., Inc., v. NLRB, 147 F.3d 333 (4th Cir.1998). The facts of Glenmark should be distinguished from the facts in this case. In Glenmark, the nurses had the authority to alter patient assignments, call in additional CNAs for work, and allow CNAs to go home early. 147 F.3d at 341. The undisputed record in this case demonstrates that Attleboro's LPNs have no authority to reorganize the schedule, request additional CNAs, or allow CNAs to go home early. Krick testified that Dave Johnson, the scheduling coordinator at Attleboro, has the responsibility for scheduling and staffing of the floors on a weekly basis. App. at 53. DON Delcambre testified that Johnson also has primary responsibility for finding replacement employees. App. at 123. Only if a supervisor requests assistance, would the Attleboro LPN help with phone calls to find replacement employees or ask employees on their shift if they would stay late. App. at 104, 123. Krick further revealed that the shift supervisor, not an LPN, would transfer a CNA to another floor to address a staff shortage. App. at 88. LPN Sharon Haley and LPN Donna Mohollen testified that their supervisors determined whether a CNA could leave early. App. at 194, 203.
 
 
 102
 On the day shift, the unit managers, the LPNs, and the CNAs work together in assigning the unassigned CNAs to work with particular patients. App. at 207. LPN Mohollen further testified that if the CNA did not want the assignment given, she would go to her unit manager to resolve the conflict. App. at 208. The limited role that the LPNs serve in the assignment of the CNAs does not justify a determination that they manage the assignment of the CNAs. Furthermore, the Board properly concluded that "distributing daily assignments to employees whose skills are not significantly varied, or to employees with different skills whose abilities are well known, is generally routine and not supervisory." App. at 336.
 
 
 103
 The limited supervision exercised by the LPNs in their assignment and direction of the CNAs is more properly viewed as an exercise of their professional skills rather than an exercise of independent managerial judgment. The Seventh Circuit recently emphasized this concept as follows:
 
 
 104
 The most important point that the Center overlooks in emphasizing the supervisory responsibilities of the charge nurses ... is that nurses are professionals and their exercise of supervision is guided by professional training and norms. The charge nurses in this case are registered nurses, who are highly trained and responsible. Supervision exercised in accordance with professional rather than business norms is not supervision within the meaning of the supervisor provision, for no issue of divided loyalties is raised when supervision is required to conform to professional standards rather than to the company's profit-maximizing objectives.
 
 
 105
 Grancare, 170 F.3d at 666-67 (quoting Children's Habilitation Ctr., Inc. v. NLRB, 887 F.2d 130, 134 (7th Cir.1989)).
 
 
 106
 CNAs at Attleboro function just as the name of the position, certified nursing assistant, implies--as assistants to nurses who possess more knowledge and skills. The position of an LPN charge nurse at Attleboro requires the nurse to possess a two- or four-year degree from a nursing school, as well as a current practical nurse license. On the other hand, a CNA need only have an eighth grade education and to pass a certification program that consists of seventy-five hours of training to meet the minimum qualifications of the CNA position. Based on their respective educational background and training, a CNA clearly does not know as much as the LPNs about the proper medical treatment of the residents.[3] DON Delcambre testified that in a medical emergency, the LPN may take control and determine "what level of care and what sense of urgency for care that resident" requires. App. at 142-43. The LPN would then ask for RN backup, and assistance from the CNA that could include directions to obtain medical supplies. App. at 145. The roles of the LPNs and CNAs as described in the record supports the Board's conclusion that the LPNs were merely utilizing their greater skill and expertise to assist a lesser-skilled employee in correctly performing their duties.
 
 
 107
 The exercise of professional judgment does not preclude the exercise of independent judgment. Such a rule would mean that a professional could never function as a supervisor. In this case, the RNs who function as unit managers and shift supervisors clearly exercise both professional judgment as nurses and independent judgment as supervisors. However, in the case of the RNs who are unit managers and shift supervisors, their supervisory role is not limited to situations requiring professional judgment. For example, the RNs determine whether a CNA can leave a shift early. On the other hand, the LPN charge nurses at Attleboro, for the most part, exercise only professional medical judgment in assigning and giving directions to CNAs in a limited manner.
 
 III. CONCLUSION
 
 108
 Substantial evidence supports the Board's determination that Attleboro's LPN charge nurses do not qualify as supervisors under section 2(11). The Board interprets "independent judgment" in a reasonable manner that is not arbitrary or capricious. Moreover, the record as a whole demonstrates that the Attleboro LPNs do not exercise "independent judgment." Their supervision is limited to situations either requiring only routine decisionmaking or professional guidance over lesser-skilled CNAs.
 
 
 109
 Accordingly, I would enforce the Board's orders and deny Attleboro's petition for review.
 
 
 
 *
 Honorable Myron H. Bright, Senior Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [1]
 Section 2(11) of the NLRA defines a "supervisor" as
 any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 29 U.S.C. § 152(11).
 
 
 [2]
 In light of Health Care, the NLRB does not suggest that Attleboro's LPN charge nurses do not act "in the interest of the employer."
 
 
 [3]
 The Court in Health Care outlined the three-prong test to be used in deciding the section 2(11) supervisor issue as follows: "First, does the employee have authority to engage in one of the 12 listed activities? Second, does the exercise of that authority require 'the use of independent judgment'? Third, does the employee hold the authority 'in the interest of the employer'?" 511 U.S. at 573-74, 114 S.Ct. at 1780
 
 
 [4]
 See also Glenmark Assoc., Inc. v. NLRB, 147 F.3d 333 (4th Cir.1998), where the court commented on the NLRB's shift in focus after Health Care:
 We are not the first court to wonder whether [the Board's] new interpretation [of independent judgment] is an end run around an unfavorable Supreme Court decision in order to promote policies of broadening the coverage of the Act, maximizing the number of unions certified, and increasing the number of unfair labor practice findings it makes rather than explicate a well-reasoned interpretation of the NLRA.
 Id. at 340 n. 8.
 
 
 [5]
 The Court of Appeals for the Seventh Circuit decided Grancare after the oral argument in this case. In Grancare, the court did not take our approach which requires us to consider with precision in accordance with Passavant whether the charge nurses were exercising independent judgment with respect to any of the 12 enumerated duties in section 20(11). Instead, the Grancare court discussed the concept of "independent judgment" in a general non-particularized way. Indeed, the Grancare court came close to determining whether LPN charge nurses are supervisors categorically, as it indicated that the Board's "position [is] that the 'judgment' of LPNs in exercising their incidental supervisory authority over CNAs is not the 'independent judgment' concerned with managerial prerogatives contemplated by § 2(11)[but][r]ather, ... is more properly viewed as 'professional judgment' exercised in getting their assigned work done with the assistance of CNAs employed for that purpose." 170 F.3d at 668. The court then indicated that it seemed to it that "given the nature of the LPN charge nurses' primary work activity and incidental supervisory function in the classic pattern of these cases, the Board's construction of 'independent judgment' for application to them cannot be declared 'arbitrary [or] capricious'...." Id. In our view, a determination of whether the Board's findings in a particular case are supported by substantial evidence in the record as a whole requires a determination based on the facts of the case
 Furthermore, we agree with Judge Kanne's dissent in Grancare that the majority in that case "improperly elevates two policy concerns over the language found in the Act itself." Id. at 668. The court of appeals upheld the Board's finding that the LPN charge nurses were employees essentially by relying on the high ratio of LPNs to CNAs and the heightened importance that court gives to the exercise of disciplinary authority. Id. at 667. We, however, never have adopted a ratio of supervisors to employees as the proper test to determine supervisory status in these cases. The notion of a proper ratio is not contained in section 2(11) and the Supreme Court has not endorsed it as an analytical method for determining supervisory status. Moreover, contrary to the Seventh Circuit's practice, we do not view one of the 12 section 2(11) duties to be more indicative of "true" supervisory status than the others. Congress did not rank them according to perceived importance, and we see no reason to do so either. Thus, as with Judge Kanne's dissent, to determine supervisory status, we "rely solely upon the statutory text and not secondary indicia, such as the ratio of supervisors to nonsupervisors." Id. at 673. To do otherwise would be to usurp Congress's authority to promulgate the law. This we decline to do.
 
 
 [6]
 We hold that the Regional Director's finding that Attleboro's LPN charge nurses did not in fact exercise the authority to suspend CNAs for flagrant violations is supported by substantial evidence in the record as a whole, and thus concentrate on her conclusion concerning the LPN charge nurses' use of independent judgment in recommending discipline. However, we note that the Regional Director's legal conclusion that the power to suspend for flagrant violations does not entail the use of independent judgment is contrary to our holding in Passavant, 149 F.3d at 248-49
 
 
 [7]
 The Court of Appeals for the Fourth Circuit confirmed its stance on this issue en banc in two companion cases, Beverly Enterprises, W.Va, 165 F.3d 307, and Beverly Enterprises, Va., 165 F.3d 290
 
 
 [8]
 Cedar Ridge's LPNs also had the power to suspend CNAs for serious infractions. Glenmark, 147 F.3d at 343. Inasmuch as we find the Regional Director's decision in this case that the LPNs did not actually possess the power to suspend immediately supported by substantial evidence in the record as a whole, the Court of Appeals for the Fourth Circuit's discussion on this type of disciplinary authority is of limited utility here
 
 
 [9]
 See also Eastern Greyhound Lines v. NLRB, 337 F.2d 84, 89 (6th Cir.1964) ("We do not believe that the circumstance that dispatcher recommendations are subject to independent investigation before final action detracts from th[e] fact" that the dispatchers effectively recommended discipline using independent judgment.); NLRB v. Southern Airways Co., 290 F.2d 519, 524 (5th Cir.1961) ("[T]he very fact that the Employer considered that these recommendations justified the time and expense of an investigation reflects the substantial significance attached to them.")
 
 
 [10]
 Section 2(12) defines a professional employee as
 (a) any employee engaged in work (i) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital, as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes; or
 (b) any employee, who (i) has completed the course of specialized intellectual instruction and study described in clause (iv) of paragraph (a), and (ii) is performing related work under the supervision of a professional person to qualify himself to become a professional employee as defined in paragraph (a).
 29 U.S.C. § 152(12).
 
 
 [11]
 To the extent that Beverly Enterprises, Minn., 148 F.3d 1042, is irreconcilable with our decision today, we simply note the conflict among the various circuits to which we alluded above
 
 
 [1]
 In the Board's two orders denying Attleboro's request for review of the Regional Director's Decision and Direction of Election and granting the NLRB's motion for summary judgment, the Board did not interpret the term "independent judgment." App. at 418 and App. A to Attleboro's Br
 
 
 [2]
 The factual findings in this case can also be distinguished from the factual findings at issue in this court's decision that Passavant relies upon, Warner Co. v. NLRB, 365 F.2d 435, 438 (3d Cir.1966). The supervisors in Warner resolved "complaints regarding work or vehicle assignments, work during lunch periods, starting times, and so forth." Id. Attleboro's LPNs have no authority to adjudge grievances regarding assignments or scheduling. See App. at 332
 
 
 [3]
 DON Delcambre testified about a medical emergency where a CNA reported to the LPN that a resident had sustained a minor skin tear while bathing. The LPN in assessing the situation recognized that the resident, in fact, had fractured his toe and required hospital attention and multiple sutures. App. at 142. This testimony reveals that the CNA simply did not have the medical background to determine the needs of this resident. I suggest this represents the use of professional skills, rather than supervision